Charles E. CRAFT

v.

The UNITED STATES.

No. 96–74.

United States Court of Claims.

Dec. 13, 1978.

**1058**

Charles E. Craft, pro se.

Russell W. Koskinen, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant. James F. Merow, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and KUNZIG and BENNETT, Judges.

## OPINION

PER CURIAM:

■ This case has been reviewed by the court on defendant's exceptions to the decision of Trial Judge Kenneth R. Harkins, filed January 26, 1978. Upon consideration of those exceptions, supporting brief, and oral argument, the court fully agrees with the trial judge and adopts his opinion, which follows, as the basis for its judgment in this case. Because plaintiff's civilian earnings during the period of his illegal separation from employment were in excess of the balance due on his claim for backpay, he is not entitled to recover, and it is so ordered. However, because defendant has laid such emphasis upon a challenge to our jurisdiction in this case, we will, by additional comment here, underscore our approbation of the trial judge's rejection of defendant's contentions.

Defendant's basic assertion is that in order for the court to extend the collateral relief of restoration to duty and correction of records, pursuant to 28 U.S.C. § 1491, it must enter a money judgment to which such relief can attach. Defendant would refine this proposition to hold that, where liability has been found and a case has been remanded to the trial division to fix the damages pursuant to Rule 131(c)(2) and the trial judge finds no monetary loss because plaintiff's outside earnings when offset are more than backpay otherwise due, we then have no jurisdiction and must set aside the earlier judgment holding defendant liable and providing collateral relief to plaintiff. Defendant says that otherwise the judgment on liability was a declaratory judgment which we have no jurisdiction to grant. *United States v. King*, 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). This contention was recently raised in a tax case where, in a suit for refund, defendant tendered the refund and argued there was thus no money claim before the court and that under *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), the court lacked jurisdiction. In rejecting this defense the court pointed out that there was jurisdiction when the petition was filed, that the refund was made later, and that plaintiff, who had incurred discovery expenses pertinent to the claim and to claims not yet brought, should not be thus deprived of the collateral estoppel benefit by defendant's payment on one claim. The court said, in *Hotel Conquistador, Inc. v. United States*, Ct.Cl. No. 374–75 (order, Oct. 2, 1978):

> * * * Payment is normally not jurisdictional but a matter of defense. *Testan* does not hold that a court having jurisdiction of a suit as filed suddenly loses it at a time chosen by defendant, whenever defendant tenders payment.

*See also Church of Scientology of Hawaii v. United States*, 485 F.2d 313 (9th Cir. 1973).

The case before us is very much the same. Payment, a bookkeeping matter here, did not occur by defendant until it made the offset against plaintiff's backpay, which had earlier been determined to be due by the court. *Craft v. United States*, 544 F.2d 468, 210 Ct.Cl. 170 (1976). Defendant's action did not moot the viable, justiciable

controversy presented by the pleadings. Carried one step further, defendant's theory would next deprive plaintiff of retired pay, which he is now receiving as a result of collateral relief to the holding of backpay liability. Defendant's counsel admitted at oral argument that he believed suit would be possible to recover it. The required correction of plaintiff's records would topple with the rest of this legal fiction. We cannot subscribe to such a bizarre procedure and result in the administration of justice. The purpose of our rules, stated in Rule 1, is "to promote the just, speedy, and inexpensive determination of every action."

■ Where a petition asserts a claim arising under an act of Congress or the regulation of an executive department, the Court of Claims has jurisdiction to decide whether the complaint states a cause of action. Failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. *Ralston Steel Corp. v. United States*, 340 F.2d 663, 169 Ct.Cl. 119, *cert. denied*, 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 723 (1965).

■ In the present case this court rendered a judgment on the liability issue. *Craft v. United States, supra*. Although this was not a final judgment with respect to the amount of the monetary claim, it was a final judgment as to entitlement to backpay and collateral relief. Under the rules it is provided:

> * * * the court, upon entering judgment that a party is entitled to recover, may reserve determination of the amount of the recovery for further proceedings. In such event, the judgment on the question of the right to recover shall be final * * *. [Rule 131(c)(2).]

The Supreme Court has never hesitated to review our "liability" judgments without any question as to the propriety of doing so.

The necessity of granting collateral relief, even though a monetary award may not be due, is mandated by the nature of the backpay claim. A cause of action for backpay based upon an illegal discharge accrues on the date of the discharge for statute of limitations purposes. *See, e. g., Kirby v. United States*, 201 Ct.Cl. 527 (1973), *cert. denied*, 417 U.S. 919, 94 S.Ct. 2626, 41 L.Ed.2d 224 (1974); *O'Callahan v. United States*, 451 F.2d 1390, 196 Ct.Cl. 556 (1971). The obligation of the United States to pay a certain sum is not fixed as of that date; indeed, at that date no sum may yet be due. The claim is instead for a period beginning with the date of the wrongful termination up until the time of final judgment in this court (if the employee does not request any collateral relief) or up until the time of corrective action by the agency involved. It is true that an employee cannot unreasonably delay the commencement of his action in this court in the hopes of greatly increasing his recovery, for the employee may well be barred from asserting a meritorious claim by the defense of statute of limitations or laches. We cannot, however, determine at the time an employee files his petition in this court that he is or is not entitled to a net monetary award for his backpay claim, even if he were to prevail on the liability issue, because his entitlement is conditioned on the mitigation of his entitlement to his Government salary by offset of civilian earnings. The amount of civilian earnings is a factor which is not capable of determination or control by the court; thus, a party who has a "net loss" (recomputed earnings minus civilian earnings) at the time of filing his petition may actually receive no monetary award, and, conversely, a party who has no loss at the time his petition is filed may very well receive a monetary award. Our jurisdiction does not depend on this factor, nor does it make sense that our power to grant collateral relief, and thus actually fix the period for a pay award, depends on the happenstance of future events. Accordingly, contrary to defendant's contention, the plaintiff is not required to allege in his petition that the amount of backpay to which he is entitled exceeds any civilian earnings he had since his unlawful discharge.

Defendant says, however, that in such circumstances as here, we should either dismiss the petition or transfer the case to a district court. This has never been the

practice. In most of our merits cases, whether tax, pay, contract, or other category, we first determine the liability of the United States, subject to remand to the trial division for precise calculation of the amount due pursuant to Rule 131(c). This has been the published rule since 1951. This time-honored practice, whose worth has never been questioned until *Hotel Conquistador, Inc. v. United States, supra,* results in judicial economy and often saves time and money for the parties. For instance, if a plaintiff loses on proof of liability on a breach of contract claim, the parties will be saved from presentation of elaborate proof that would be useless on damages. Of course, there is the occasional possibility that a plaintiff who prevails at the liability phase may later be found to be owed no money at all, as here. Defendant's present theory would require us to dismiss all of these cases at that point for lack of jurisdiction, which this court has never done, and, as a practical matter, it would require that we abandon the bifurcation of liability and damages for trial, a step backwards in judicial procedures. *Cf.* Fed.R.Civ.P. 42.

If defendant thinks there is any real merit to its contention, it should seek, as a guardian of justice and efficiency in treatment of claims, the assistance of Congress to amend the declaratory judgment statute, 28 U.S.C. § 2201, to include the Court of Claims, as the Supreme Court, in *United States v. King, supra,* suggested would be appropriate. Until that day we will continue to proceed on the basis of our precedents and rules and on what we think is right and just and clearly within our authority to adjudicate and avoid absurd or whimsical results. We sustain the trial judge and reject defendant's jurisdictional challenge. Plaintiff's petition is dismissed.

## OPINION OF TRIAL JUDGE

HARKINS, Trial Judge:

This case previously was before the court on cross-motions for summary judgment on liability issues and the facts were detailed in the June 16, 1976, opinion. On those facts, treatment plaintiff had received from the Army was characterized as "reprehensible." [1] The Army was ordered to reinstate plaintiff (with his consent) in the rank of sergeant, first class (E–7),[2] for a period at least equal to 3 years, 5 months, and 25 days, effective May 31, 1973, and to correct plaintiff's applicable records consistent with the opinion. The amount of recovery on plaintiff's claim for an award of backpay was ordered to be determined pursuant to Rule 131(c).

Initially, arrangements to effectuate the judgment were negotiated by counsel for plaintiff and a representative of Army JAGC. In an affidavit signed October 12, 1976, plaintiff requested not to be recalled to active duty and that he be voluntarily retired. On November 26, 1976, by Orders D101–11, plaintiff's Army records were corrected and he was certified to be removed from the Temporary Disability Retired List on May 31, 1973; reenlisted, with consent, in the United States Army, in the grade of master sergeant (E–8), effective May 31, 1973; and, effective November 30, 1976, was relieved from active duty and retired under the provisions of 10 U.S.C. §§ 3914 and 3961 in the grade of master sergeant (E–8). Plaintiff was placed on the retired list, effective December 1, 1976, and retired pay was started on February 1, 1977, retroactive to December 1, 1976.

Disposition of plaintiff's claim for backpay has been protracted because the parties have been unable to stipulate or otherwise agree upon a computation. The principal difficulty has been confusion about the constructive status that results from correction of military records *nunc pro tunc* and the effect of that status on interim civilian earnings and a prior military severance payment. Defendant would offset all of plaintiff's backpay award by his greater

---

1. *Craft v. United States,* 544 F.2d 468, 474–75, 210 Ct.Cl. 170, 182 (1976).

2. The opinion noted that the statute which grants the right to reenlistment permitted the Secretary to reenlist plaintiff in the next higher grade.

civilian earnings and would recoup, over a prolonged period, the prior severance payment by deductions from plaintiff's recently secured retirement benefits. Plaintiff views this procedure as rendering his June 16, 1976, victory hollow and refuses to agree to any adjustment, either for civilian earnings or for the severance payment refund. This difficulty has been compounded by plaintiff's mistrust and removal of his counsel, and plaintiff's belief that representatives of defendant have continued deceptive and unfair tactics. These difficulties have produced a situation that has required three Rule 13 orders from the trial judge, in an attempt to secure additional information, and warrant an examination in greater detail than is customary in military pay Rule 131(c) proceedings.

On March 14, 1977, plaintiff's counsel moved for leave to withdraw his appearance. The motion was allowed on April 19, 1977, and, thereafter, plaintiff has been represented pro se. Subsequently, documents furnished by the parties showed a disagreement between plaintiff and his counsel had developed in January 1977 with respect to a recommendation that plaintiff waive his claim for backpay. In February 1977, plaintiff had notified the Army, through the Congressional Inquiry Division, that "(1) this Attorney no longer represents my best interest. (2) any further transactions will be done through me." On March 14, 1977, plaintiff notified the Department of Justice attorney that he was no longer represented by his former counsel and that "any agreement made between the two of you concerning my case is voided."

On April 22, 1977, defendant moved for an order directing plaintiff to furnish a statement of plaintiff's civilian earnings for the period June 1, 1973, through November 30, 1976. This motion was allowed on May 11, 1977. By May 24, 1977, defendant had been furnished a statement of civilian earnings, and, on July 29, 1977, defendant submitted a proposed stipulation of settlement, which plaintiff refused to sign. Defendant's stipulation of settlement would have "set off" plaintiff's gross backpay entitlement of $49,367.05 by an equal amount of plaintiff's civilian earnings, and would have required plaintiff to consent to an entry of judgment on a counterclaim for the severance payment in the amount of $17,064.62, such amount to be withheld from plaintiff's retired pay.

A copy of plaintiff's letter to defendant's counsel that rejected the proposed stipulation was received on August 12, 1977. The letter attached an undated letter addressed to the trial judge, which purportedly had been distributed on June 28, 29, and 30, 1977, during plaintiff's picketing of the federal courthouse in Seattle, Washington.[3] Although plaintiff's letter to defendant's counsel was intemperate,[4] it asserted the stipulation was contrary to an agreement made with representatives of the Army in Senator Warren G. Magnuson's office on

---

3. The letter apparently was submitted also to Senator Henry M. Jackson on May 20, 1977.

4. The letter stated, in part:

"No. I will not sign the proposed stipulation.

"If all these numbers and this gobble de gook represents your best effort, you may as well shoot me now, you are working hard on my will to contain my want to commit acts of violence, you and the Army knew you were wrong, at least in 1970, when you started to give me the run around, about a rehearing of my case that the army scheduled for Sept. 1970, you lied and hid behind so called red tape, forced into the open, you had a second lt. try to rig a hearing, on two occasions, when I refused to bite, you had the army threaten to remove my name from the rolls, I did sit with Col. Stoller, you and the army refused his decision just as you did the one from the Persidio.

I wrote to President Ford, Gen. Persons intercepted it, in his reply I was raked for not going thru Military channels to present my complaint he seemed to possess a short memory, what of the two boards, the military channels threw out? He promised to defeat me in a Court of law, again he Lied. The Attorney who presented the army's case, appeared in court in a disrespectful manner, (like a hippie) hair uncombed, last weeks unpressed suit on, topped by what appeared to be an army poncho, when called upon to part with the army's reason for coming to court, he seemed to have two blanks (1) the sheets of paper that he kept shuffling (2) a mind void and not caring about what was going on around him. Not hearing anything from the army, I went to picket the White house 10 Oct. 1976, * * * [sic]."

October 12, 1976, to the effect that neither party would claim backpay if plaintiff retired.[5]

In the letter addressed to the trial judge, plaintiff asserted that the statement on civilian earnings, ordered on May 11, 1977, had been provided to plaintiff's counsel on October 26, 1976, and was given to the Army legal staff at that time.[6] The letter contains a detailed statement of plaintiff's view of the history of his case and of the mistreatment he has received from the Army, and includes a description of the agreement purportedly made in Senator Magnuson's office on October 12, 1976. The letter states in part:

3. On the 12th of Oct. 1976 in the office of Senator Warren G. Magnuson, the Army said that they were agreeable to starting that day, that neither party would lay any claim to anything past. I would be discharged on the last day of Nov. 1976. My name would then be entered on the retired list and I would start receiving my retirement pay 31 Dec. 1976. I was then told that I would have to waive my right to return to active duty. This statement was signed in Mr. Rein's office, this statement was then notarized by Mr. Rein's secretary. Instead of receiving my retirement pay as agreed to on the 12th of Oct. 1976 in Senator Magnuson's office, I received a letter dated 18 Feb. 1977 from the director of retired pay operations. In it he explains how Mr. Rein has requested a waiver on any back pay I may have due. Yet the Army is to collect that amount deemed due over a period of three years, this is not the agreement I made with the Army. Somehow I feel that I was not being dealt with in the manner in which the court's decision specified. * * *

In conclusion I beg the court to force the Army to end this childish act and abide by the court's decision. The Army's council is guilty of at the very least malicious intent. [Sic]

In view of the inability of the parties to proceed by stipulation or agreement, and to obtain information about plaintiff's allegation, a Rule 13 order was entered on August 12, 1977. The order stated:

IT IS ORDERED that, on or before September 12, 1977, defendant shall file with the clerk, the following:

1. A copy of the stipulation for settlement of this case that was presented to plaintiff, together with a statement of legal and regulatory requirements sought to be applied in the settlement offer;

2. A chronology that includes a descriptive summary and copies of relevant documentary materials (including memoranda of telephone conversations or of meetings) of all communications between plaintiff or plaintiff's counsel and representatives of the defendant since June 16, 1976, relative to implementation of the court's June 16, 1976, order; and

3. With respect to the meeting on October 12, 1976, in the office of Senator Warren G. Magnuson, copies of any documents executed by plaintiff or plaintiff's counsel and copies of any memoranda or other records of communications between representatives of the defendant relative to such meeting.

5. Plaintiff's letter stated, in this connection:
"* * * On 12 Oct 1976 In Senator Magnuson office, the Capt. assigned to handle my case, with full approval of the secretary of defense, agreeded that neither of us would lay claim to back pay, if I would sign a request to retire, again like a fool, I believed there was still some honor left in this society and I signed it. while you and gen. Persons continued to stink up any and all that came near you. * * [sic]"

6. The data in the October 26, 1976, statement apparently were transmitted to the Army orally on November 1, 1976, and the statement was delivered physically to the Department of Justice and to Army JAGC on or about May 24, 1977.

Plaintiff, in a letter dated September 1, 1977, submitted copies of 42 documents.[7] Defendant's response to the August 12, 1977, order, filed September 12, 1977, attached the offer of settlement and 62 pages of documentation. These materials made it clear that the parties would be unable to stipulate or otherwise agree upon a Rule 131(c) computation, and the information submitted was insufficient to resolve the factual disputes and the policy considerations involved in the treatment of plaintiff's civilian earnings and severance payment. The parties were directed to provide additional information by another Rule 13 order on September 19, 1977.[8]

On November 7, 1977, plaintiff submitted a letter that stated he had nothing to add to the material he had already submitted and that he owed attorneys' fees in excess of $2,800. With respect to the proposed recoupment of the severance payment from his retirement benefits, plaintiff asserted:

> * * * now to say that I must pay back the 17000, its just too much, and the Army will continue to use tax payers money to make up for a lack of moral character. I beg the Court to hear my plea, why must I lose the years from 1969–1973 and pay for the crime the Army committed [sic].

Defendant's response, filed November 8, 1977, was incomplete in that the letter on behalf of the Secretary of the Army failed to respond to subparagraphs 2(a) and (b) of the September 19, 1977, order. On November 10, 1977, defendant was ordered to file a supplementary statement in response to the September 19, 1977, order and to provide additional factual information relative to actions that had occurred in the Rule 131(c) proceedings. Defendant's further response and the additional information were filed on December 9, 1977.

Although both parties have supplied substantial amounts of materials, it is clear that neither party has furnished all of the information called for by the Rule 13 orders. Plaintiff, for example, did not furnish a copy of the January 28, 1977, letter to him from his former counsel, which recommended that plaintiff sign a proposed letter dated January 25, 1977, waiving his claim for backpay. With respect to the alleged October 12, 1975, meeting and agreement in Senator Magnuson's office, defendant asserts that no representatives of defendant were present at the meeting nor do any of defendant's representatives have any memoranda or other records relative to

---

7. The transmittal letter stated, in part:

"Dear Judge Harkins

"After having had prior dealings with the Army high command and their legal council, knowing their mode of operation, it is not far fetched or unfair of me to think, they will try to trick you too. To prevent them claiming contact that was never made, I am sending you all the things that has ever reached me, since the courts decision was handed down, plus a letter from General persons dated 25 July 1975, * * [sic]."

8. The order directed in part:

"2. On or before November 7, 1977, each party shall file with the clerk a statement addressed to the policy considerations involved, together with the legal justification for any recovery from retirement entitlements of severance payments that were made as a result of the erroneous termination by the Secretary of the Army of an enlistment when subsequently the enlisted person is reenlisted pursuant to court order and immediately thereafter retired. Defendant's statement shall attach a separate statement prepared by military personnel on behalf of the Secretary of the Army, that shall include information on the following.

"(a) Why is a period of constructive service directed by court order includible in the computations required by 10 U.S.C. §§ 1203, 1206, and 1208?

"(b) Specify any Army regulation that directs inclusion of periods of constructive service directed by court order in such computation.

"(c) Describe when and the method by which the determination of indebtedness required by 5 U.S.C. § 5514(a) was made with respect to Charles E. Craft.

"(d) Historically, what has been the practice of the Department of the Army with respect to deductions from retirement entitlements of severance payments that had been made through errors for which the Army solely was responsible.

"(e) Cite any judicial or GAO rulings applicable to withholding of amounts equivalent to severance payments from retirement entitlements of former members of the armed services when such former member was reenlisted pursuant to court order."

such meeting. Defendant has not provided a copy of a letter dated November 30, 1976, which was referred to in a February 18, 1977, letter from the U.S. Army Finance and Accounting Center (USAFAC), addressed to plaintiff, in which plaintiff's attorney, purportedly, "requests waiver for back pay due in your behalf."

Although many of plaintiff's allegations, including details of the alleged agreement in Senator Magnuson's office, cannot be resolved through the responses to the Rule 13 orders, sufficient factual information has been provided to deal with the Rule 131(c) issues relative to plaintiff's backpay claim. The statements and information provided by defendant show that the legal and policy considerations applicable to plaintiff's claim have not been applied in a consistent manner by the various representatives that dealt with the claim.

Plaintiff's military records were changed, pursuant to the court's ruling that plaintiff had been improperly separated, to allow credit for the period June 1, 1973, to November 30, 1976. During this period, plaintiff, in fact, was employed by the Union Pacific Motor Freight Company as a civilian and had earnings from his civilian job. When the Army changed his military records to correct its mistake, in addition to becoming eligible for the retirement benefits allowable in his new status, plaintiff became entitled to compensation for the period of constructive service in accordance with the status shown on the corrected record. Plaintiff's entitlement to military compensation, as computed by USAFAC, is:

SUBJECT: USAFAC Computation of Settlement Amount Due Pursuant to U. S. Court of Claims Decision 96-74

CREDITS
ACTIVE DUTY ENTITLEMENT

| Grade | Years Basic Pay | Monthly Rate | Period | Total |
|---|---|---|---|---|
| E-8 | o/21 | $ 846.60 | 1 June 73-30 Sep 73 | $3,386.40 |
| E-8 | o/21 | 898.80 | 1 Oct 73-17 Jan 74 | 3,205.72 |
| E-8 | o/22 | 951.30 | 18 Jan 74-30 Jun 74 | 5,168.73 |
| E-8 | o/22 | 951.30 | 1 Jul 74-30 Sep 74 | 2,853.90 |
| E-8 | o/22 | 1,003.80 | 1 Oct. 74-17 Jan 75 | 3,580.22 |
| E-8 | o/23 | 1,003.80 | 18 Jan 75-30 Jun 75 | 5,453.98 |
| E-8 | o/23 | 1,003.80 | 1 Jul 75-30 Sep 75 | 3,011.40 |
| E-8 | o/23 | 1,053.90 | 1 Oct 75-17 Jan 76 | 3,758.91 |
| E-8 | o/24 | 1,053.90 | 18 Jan 76-30 Jun 76 | 5,726.19 |
| E-8 | o/24 | 1,053.90 | 1 Jul 76-30 Sep 76 | 3,161.70 |
| E-8 | o/24 | 1,092.00 | 1 Oct. 76-30 Nov 76 | 2,184.00 |
| | | | | $41,491.15 |

| Item | Monthly Rate | Period | Total |
|---|---|---|---|
| CMAB | $5.40 | 1 Dec 73-30 Jun 74 | $ 37.80 |
| CMAB | 5.70 | 1 Jul 74-30 Jun 75 | 68.40 |
| CMAB | 6.30 | 1 Jul 75-31 May 76 | 69.30 |
| CMAS | 9.00 | 1 Jun 76-30 Jun 76 | 9.00 |
| CMAS | 9.00 | 1 Jul 76-30 Sep 76 | 27.00 |
| CMAS | 6.60 | 1 Oct 76-30 Nov 76 | 13.20 |
| | | | $224.70 |

| | | | |
|---|---|---|---|
| BAQ w/depns | $172.20 | 1 Jun 73-30 Jun 74 | 2,238.60 |
| BAQ w/depns | 172.20 | 1 Jul 74-30 Sep 74 | 516.60 |
| BAQ w/depns | 181.80 | 1 Oct 74-30 Jun 75 | 1,636.20 |
| BAQ w/depns | 181.80 | 1 Jul 75-30 Sep 75 | 545.40 |

| Item | Monthly Rate | Period | Total |
|------|-----------|--------|-------|
| BAQ w/depns | 190.80 | 1 Oct 75–30 Jun 76 | 1,717.20 |
| BAQ w/depns | 190.80 | 1 Jul 76–30 Sep 76 | 572.40 |
| BAQ w/depns | 212.40 | 1 Oct 76–30 Nov 76 | 424.80 |
| | | | $7,651.20 |
| Total Credits and Entitlements | | | $49,367.05 |

DEBITS

| Item | Monthly Rate | Period | Total |
|------|--------------|--------|-------|
| USSH | $0.10 | 1 Jun 73–30 Jun 74 | $1.30 |
| USSH | 0.25 | 1 Jul 74–30 Jun 75 | 3.00 |
| USSH | 0.25 | 1 Jul 75–30 Jun 76 | 3.00 |
| USSH | 0.25 | 1 Jul 76–30 Nov 76 | 1.25 |
| SGLI | 3.00 | 1 Jun 73–30 May 74 | 36.00 |
| SGLI | 3.40 | 1 Jun 74–30 Jun 74 | 3.40 |
| SGLI | 3.40 | 1 Jul 74–30 Jun 75 | 40.80 |
| SGLI | 3.40 | 1 Jul 75–30 Jun 76 | 40.80 |
| SGLI | 3.40 | 1 Jul 76–30 Sep 76 | 10.20 |
| SGLI | 3.40 | 1 Oct 76–30 Nov 76 | 6.80 |
| | | | $146.55 |

| | |
|---|---|
| FICA Wages Maximum is $16,500.00 times 5.85% = FICA Tax | 965.25 |
| Federal Income Tax Wages of $41,491.15 times 20% for Federal Tax = | 8,298.23 |
| Net Severance Pay [*] | 17,064.62 |
| Total Debits | $26,474.65 |
| Balance Due Subject to Further Reduction of Civilian Salary [**] | 22,892.40 |

[*] By letter dated December 15, 1977, the USAFAC advised plaintiff that inclusion of net severance payment was incorrect, and that the computation should include the gross severance payment of $17,920.80.

[**] With gross severance pay included, the total debits became $27,330.83 and the balance due becomes $22,036.22.

---

The records show that plaintiff, for the years 1973, 1974, 1975, and through October 9, 1976, was paid a total of $60,027.75 by the Union Pacific Motor Freight Company. The amounts for each calendar period were:

| | |
|---|---|
| 1973 | $13,432.97 |
| 1974 | 13,456.30 |
| 1975 | 16,033.87 |
| 1976 through 10/9/76 | 17,104.61 |

There are three issues for decision—On these financial facts, does plaintiff have a monetary claim pending after the military record has been corrected? What is the relationship of plaintiff's civilian earnings to his military pay entitlement for the period of constructive service after the military records have been changed? How does the change in the military records affect plaintiff's entitlement to retain a severance payment that complied with statute and regulation when made?

*Pendency of a Monetary Claim*

Defendant contends that, inasmuch as plaintiff's civilian earnings exceeded his military entitlement to backpay for constructive service, plaintiff, in reality, had no monetary claim against the United States in the first instance. Defendant points out that, if plaintiff had no monetary claim, the court lacked jurisdiction to render any re-

lief pursuant to the rule in *Testan*.[9] Defendant then continues that, after the military records were corrected, plaintiff has no present money claim and, absent a permissive counterclaim to recoup the severance payment, or absent deductions from retirement pay, "it may well be that the Court does not have jurisdiction to rule on this severance pay issue," and cites the declaratory judgment ruling in *King*.[10]

Defendant's contentions reflect a too mechanical application of the theories, and administrative practices, involved in the artificial status that results from a correction of military records. It would be most strange for the court to be ousted of jurisdiction because the process of putting into effect the relief it validly had ordered results in a computation that no backpay ultimately would be due.

Plaintiff's case, as filed, included a claim for backpay because his separation had been improper; the court recognized the existence and validity of this claim. Plaintiff's right to the money he would have received, but for the Government's error, persists until final disposition of the case. The fact that plaintiff had earnings outside the Government does not affect the existence of a monetary claim against the Government at the time the case was instituted, or at the time the court found it was valid and owing. The constructive status that results from record changes, administratively made pursuant to the court's order, does not eliminate plaintiff's status as a civilian improperly denied military status and removed from the Army, or eliminate the errors committed in his removal, even though such errors no longer appear on the face of the Army's records. The changes in plaintiff's records, and the resulting constructive military status, are matters that ease administration in the military establishment by permitting application of statute and regulation to the new status in the corrected record. The claim for backpay persists, however, even though the outside civilian earnings may exceed the constructive backpay entitlement that flows from the newly created military status. Neither the court's order nor the administrative correction of defendant's records eliminates plaintiff's status as a civilian during the period of his wrongful separation, or takes away his right, and obligation, to receive income during that period from nonmilitary sources. Plaintiff's claim for backpay existed when the case was instituted and it continues until the final computation and adjustments are made in the ultimate disposition of the case. Once jurisdiction attaches, interim administrative procedures in compliance with the court's judgment on liability do not oust the court of its jurisdiction.

### Civilian Earnings

A major cause of the difficulties in these Rule 131(c) proceedings has been a general confusion about the Government's relationship to plaintiff's civilian earnings during the period of constructive service that was generated by the correction of records. Defendant's jurisdictional argument that no monetary claim in fact existed must proceed from a concept that the mere existence of civilian earnings in excess of any backpay that could be awarded, creates in the Government, if the records were to be changed, a right that eliminates plaintiff's claim in toto. It presupposes that correction of plaintiff's status in defendant's military records somehow is effective to alter the condition that plaintiff in the interim in fact had been a civilian on the outside with a need to support himself through outside earnings. Such earnings were essential for self support and were proper; no *nunc pro tunc* change in defendant's military records can alter the legitimacy of plaintiff's right to have earned, and to retain, them. The record change affects only plaintiff's status in the military; it eliminates a military record of the Army's error; it corrects, but does not eliminate, the wrong that was done to plaintiff; and it does not make improper earnings

---

**9.** *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976).

**10.** *United States v. King*, 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969).

necessitated by the Army's erroneous separation or create in the defendant a right or a claim to any part thereof.[11]

The Department of Justice was advised by Army JAGC that the Army considered plaintiff's civilian earnings for the period of constructive service to be a debt owed to the United States that could be recouped. A letter dated March 24, 1977, from the Army JAGC representative to the Justice Department attorney, states in part:

> * * * I am informed by the Retirement Branch, USAFAC, that Mr. Craft's civilian earnings will have to be recouped and after final settlement, his retirement payments will be reduced in order to liquidate the debt owed the Government. USAFAC classifies Mr. Craft's civilian earnings for the period from May 1976 until 30 November 1976, as a debt owed the United States. * * *

This concept, if in fact the civilian earnings were a debt to the Government, would permit the Army to recoup payments previously made by the Government (a severance payment in plaintiff's case) as well as the total amount of plaintiff's earnings from nongovernmental sources. USAFAC, however, did not structure plaintiff's backpay account as though the civilian earnings were a debt to be recouped. USAFAC's computation form provided for plaintiff to waive his backpay claim entirely if civilian earnings exceeded the net amount of backpay computed to be due. The effect of such waiver would be that a prior Government payment, which was inconsistent with the new retired status, could be recouped by deductions from retired pay. USAFAC's March 18, 1977, letter concerning plaintiff's backpay account so instructed Army JAGC. The letter states, in part:

> 3. If he wishes to waive back pay for period 1 June 1973 through 30 November 1976 because his civilian earnings exceed

the amount of $22,892.40, he may do so by checking the third block on the certificate, sign, date and return the original and one copy. Upon receipt of the certificate, collection will be established from his retired pay account to liquidate the amount of $17,064.62 severance pay in a reasonable period.

Plaintiff's attorney, on the other hand, believed that, when civilian earnings were larger than the amount of backpay earned during the period of constructive service, as a practical matter, waiver of the claim for backpay would have no significance. On this premise, plaintiff's attorney advised him, on January 28, 1977, "any statement by you waiving a claim to back pay is a mere formality." This concept is also reflected in other actions attributed to plaintiff's attorney. On November 1, 1976, plaintiff's attorney, in a telephone conversation, is said to have requested Army JAGC to allow plaintiff to waive his claim for backpay, and on November 30, 1976, to have requested a waiver of backpay on plaintiff's behalf in writing.[12]

Elimination of plaintiff's claim for backpay by the waiver would have the effect of eliminating an adjustment for severance pay made by USAFAC in its computation of plaintiff's backpay due and owing. The proposed waiver, dated January 25, 1977, requested by USAFAC and submitted to plaintiff by his counsel, was phrased so as to eliminate the claim for backpay awarded under the court's decision. It reads:

> This is to notify you that in consideration of my retirement at an E–8 grade, I am waiving my claim for back pay as awarded under the Court of Claims decision.

Classification of civilian earnings during an interim period of separation as a debt is contrary to rulings both of the Comptroller

---

11. Where a serviceman in the interim period has earnings that would be prohibited by statute in the new status created by a requested record change, benefits from the new status must be reduced by the amount of prohibited earnings. *Seastrom v. United States*, 177 F.Supp. 948, 147 Ct.Cl. 453 (1959).

12. A copy of the November 30, 1976, letter was not furnished by defendant; in any event, plaintiff never executed the waiver.

General and this court. In a May 5, 1977, decision (B–187865) relative to Army reserve officers, separated but later retroactively restored to active duty by administrative record correction pursuant to 10 U.S.C. § 1552 (1970), the Comptroller General notes expressly that interim civilian earnings may be used only to reduce the amount owed by the Government and that any excess may not be recouped. The decision states:

> * * * Thus, if the amount of the readjustment payment and other Government benefits subject to recoupment equals or exceeds the amount due the member for backpay and allowances, there would be no further setoff or deduction for interim civilian earnings, since such earnings are not recoupable but are merely deductible from any remaining amount which may be owed to the member. [56 Comp.Gen. 587, 591.]

For many years, this court has held uniformly that outside earnings are to be deducted from backpay in cases where reinstatement is ordered after an erroneous separation.[13] Unless there is a regulation or a statute that provides otherwise,[14] cases in this court routinely require the deduction of civilian earnings on an analogy to the principle of mitigation of damages. The deduction is not based on any concept of setoff, counterclaim, debt, independent cause of action in the Government, or even mitigation of damages in the traditional sense. The theory of the deduction was delineated in *Motto*;[15] the offset is based on the unusual jurisdiction of the Court of Claims in pay cases, and, in essence, is an equitable condition imposed by the sovereign through this court on parties who seek to invoke its jurisdiction. The right of the Government employee to have outside earnings during the period of erroneous separation is recognized, and it is not diluted by a constructive period of reinstatement; no independent cause of action, to be remedied by setoff or counterclaim, or by a withholding deduction for debt, exists in the Government with respect to those earnings.

The equitable condition imposed by the court in the computation of backpay awards gives recognition to the factual context wherein outside earnings would not have been received had the employee been in a position to render the services to the Government and to the principle that the Government is entitled to the complete services and undivided attention of its employee during working hours.[16] On the basis of these considerations, mitigation has been required by offset in cases where the federal employee's claim involved Government action equally as shabby as the treatment plaintiff here received.[17]

### Severance Payment

The source of funds involved in a backpay computation is significant. Unlike civilian earnings, which did not originate with the Government, plaintiff obtained the severance payment from the Government as an incident to his military status before the record correction was made. After the records were corrected, his constructive status is treated as though the erroneous period of separation did not exist. Plaintiff's resulting benefits and liabilities are dependent upon application of statutes and regulations that pertain to the reconstituted military status. According to the military records,

13. *Egan v. United States*, 158 F.Supp. 377, 141 Ct.Cl. 1 (1958); *Clackum v. United States*, 161 Ct.Cl. 34 (1963); *Garner v. United States*, 161 Ct.Cl. 73 (1963).

14. *Bates v. United States*, 453 F.2d 1382, 197 Ct.Cl. 35 (1972).

15. *Motto v. United States*, 360 F.2d 643, 645–46, 175 Ct.Cl. 862, 865–67 (1966).

16. *Silver v. United States*, 551 F.2d 295, 297, 213 Ct.Cl. 388, 390 (1977).

17. *Diamond v. United States*, 427 F.2d 1246, 1248, 192 Ct.Cl. 502, 506 (1970); *Gearinger v. United States*, 412 F.2d 862, 188 Ct.Cl. 512 (1969). Harsh results on occasion can flow from application of the offset rule and, in the light of the necessity and propriety of interim civilian earnings, in a future case equity and good conscience of the sovereign may make it appropriate to reexamine the rule on an ad hoc basis.

plaintiff no longer qualifies for disability severance pay [18] and does qualify for retirement benefits.[19] In this context, the severance payment can be treated as a payment erroneously made and plaintiff becomes liable to make restitution on acceptance of his new military status.[20]

This result, however, only obtains by virtue of the theory that the record correction relates back and retroactively changes the factual situation. The severance payment when made, on the status that in fact existed, was a correct and proper payment; it was utilized for the purpose for which it was designed—to provide a monetary cushion to soften the transition to civilian life; and such use was required by virtue of a mistake made solely by the Army. To classify this payment as a debt subject to restitution, in some circumstances, would offend equity and good conscience and would not be in the best interest of the United States.

The Comptroller General recognizes this condition as it applies to readjustment payments made to officers improperly separated and considers the payment to be subject to waiver by the Army on a case-by-case basis. This policy looks toward a result where the returning officer would have no net indebtedness in his reconstituted status.[21]

Resolution of this question is not required in this case since plaintiff's constructive backpay allowance exceeds all debts, including a charge for the severance payment. The USAFAC, in its computation of backpay, adjusted the backpay award to take into account the severance payment and other monetary benefits required to be recovered by the Government. The Comptroller General concurs in this method of computation.[22] Inasmuch as plaintiff's civilian earnings exceed his backpay claim, as so adjusted, the Government need make no payment thereon, and, as the severance payment has been recovered in the accounting, no deduction may be made from plaintiff's retirement benefits.

## CONCLUSION

Plaintiff's backpay entitlement, adjusted by deductions of all amounts due to the Government, including gross severance pay in the amount of $17,920.80, was in the amount of $22,036.22. Plaintiff's civilian earnings were in an amount in excess of the balance due on plaintiff's claim for backpay. In accordance with precedent, the backpay entitlement is offset by civilian earnings and defendant is not required to make additional payment on plaintiff's claim for backpay. Plaintiff has made restitution of all severance pay previously received and no deduction from plaintiff's retirement benefits in connection with such severance pay may be made. Plaintiff's petition is dismissed.

18. 10 U.S.C. §§ 1203, 1208, 1212 (1970).

19. 10 U.S.C. §§ 3914, 3961 (1970).

20. This principle was applied when a change in retirement status made a prior severance payment inapplicable. *Cooper v. United States*, 178 Ct.Cl. 277, 317, 352 (1967).

21. The Comptroller General's ruling in B–187865, May 5, 1977, states:
" * * * Accordingly, it is our view that claims against the officers in question arising out of such readjustment, leave and Reserve service payments may be given consideration for waiver in whole or in part under 10 U.S.C. 2774, on an individual, case-by-case basis. See 55 Comp.Gen. 113 (1975). In doing so it seems proper to consider that the purpose of the correction of the members' records and the payments which become due upon such correction are to restore the members, as nearly as possible, to the position they would have been in if the error had not been made. In such circumstances it may not be in the best interest of the United States nor in keeping with equity and good conscience to waive the total amount of the erroneous payments but only such part of the erroneous payments which would prevent the member from having a net indebtedness upon restoration to duty." 56 Comp.Gen. 587, 592 (1977).

22. 56 Comp.Gen. 587, 591 (1977).