DEAN FORWARDING COMPANY, INC.

v.

The UNITED STATES.

No. 148–83C.

United States Claims Court.

June 1, 1983.

Alan F. Wohlstetter, Washington, D.C., for plaintiff; Denning & Wohlstetter, Washington, D.C., of counsel.

Richard W. Oehler, Washington, D.C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant; Major Howard Curtis, Dept. of Army, Washington, D.C., of counsel.

## OPINION

### ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

HARKINS, Judge:

On March 16, 1983, plaintiff filed a complaint for declaratory judgment, injunctive, and other relief, with motions for a temporary restraining order and a preliminary injunction.

On March 17, 1983, counsel requested adoption of a procedure designed to eliminate the need for hearings on the motions for a temporary restraining order or preliminary injunction, and which would allow the case to proceed on cross-motions for summary judgment for a decision on the merits. Plaintiff's complaint was to be considered as its motion for summary judgment, and its memorandum in support of its motions for injunctive relief was to be considered as filed in support of the motion for summary judgment. At the hearing, plaintiff's motions for a temporary restraining order and for a preliminary injunction were withdrawn, and a briefing schedule, to be completed on or before April 25, 1983, was established for the parties' cross-motions for summary judgment. On March 18, 1983, a stipulation was filed that embodied these arrangements.[1]

Counsel completed the briefing on schedule. For the reasons that follow, defendant's motion for summary judgment is allowed and the complaint will be dismissed.

### FACTS

Facts essential for disposition of the cross-motions are not in dispute.

Plaintiff, Dean Forwarding Company, Inc. (Dean) is a regulated freight forwarder of used household goods and unaccompanied baggage. It holds Permit No. FF–438 from

1. The stipulation contained the following paragraphs with respect to damages:

"1. Should the Court rule in favor of plaintiff on the merits of this controversy, plaintiff and defendant agree that defendant will offer to plaintiff that same amount of traffic in Code 8 service for Volume 46 in the seven traffic channels involved in this proceeding that plaintiff would have received had the rate errors in plaintiff's submission not occurred.

"2. It is further agreed that should either party appeal the decision of this Court, paragraph 1 of this Stipulation shall be stayed until the issuance of the decision on such appeal, or until July 1, 1983, whichever shall first occur."

the Interstate Commerce Commission as a surface freight forwarder, and complies with regulations of the Civil Aeronautics Board governing air freight forwarders. In those capacities, Dean participates in the Department of Defense program for the transportation of used household goods and unaccompanied baggage between points in the Continental United States ("CONUS") and various overseas points throughout the Free World. Dean has been qualified for forwarding military household goods since 1972 and baggage shipments since 1977.

Plaintiff's claim arises in an ongoing Department of Defense (DOD) program in which private freight forwarders submit rates for the shipment of the personal property of military service members, their dependents, and civilian DOD employees under Government Bills of Lading (GBLs) to and from points in the continental United States and overseas. This program is referred to as the International Through Government Bill of Lading (ITGBL) program.

The Army's Military Traffic Management Command (MTMC) is charged with responsibility for directing, controlling, and supervising all functions incident to the procurement of freight transportation for DOD components, including the ITGBL program. The personal property shipments involved in the ITGBL program flow in domestic and international commerce and the responsibility for soliciting rates and establishing business terms and conditions is centralized in MTMC. Thus, while individual GBL shipments are arranged by some 298 military Installation Transportation Offices (ITOs) worldwide, the rates, terms and conditions utilized in those transactions are established by MTMC.

Under the ITGBL program, approximately 136 DOD approved freight forwarders, including plaintiff, file rates with MTMC every 6 months in order to compete for these international shipments of personal property. These rates are "single factor" rates in that they include the full charges for pick up, packing, line haul, port services, over ocean movement, delivery to residence, and unpacking.

Forwarders filing rates in response to solicitation letters must do so in compliance with the particular rate solicitation letter and MTMC's Standing ITGBL Rate Filing Instructions and Procedures (Standing Instructions). The Standing Instructions establish the following three classes of rates: "Class 1" rates are competitive filings where all traffic (GBL shipments) in a particular "channel" (i.e., from a specific point of origin to a specific destination point) is given to the forwarder submitting the lowest rate. "Class 2" rates are competitive filings where less than 100% of the traffic in a channel goes to the forwarder with the low rate and other forwarders are allowed to equal (or "Me-Too") the low competitor's rate and share in the residual traffic. "Class 3" rates (at issue in this action) are also competitive filings where, regardless of which competitor sets the low rate, other forwarders may share equally in the traffic if they "Me-Too" or equalize that low rate.

Generally, MTMC solicits Class 3 rates twice a year, by means of a solicitation letter, for 6-month performance periods known as "Volumes." In the program, each solicitation contains two procedural cycles: the "Initial Filing" (I/F), in which forwarders compete to set the low rate for each channel, and a subsequent "Me-Too" (M/T) cycle in which forwarders who did not set the low rate for a particular channel may adjust their rates and share equally in the traffic. Typically, over one million separate rates are submitted on computer readable magnetic tape, by the forwarders to MTMC for each "Volume". These magnetic tapes are then entered into the MTMC computer which evaluates and reduces these rates to a format which can be utilized by MTMC and the various ITOs.

This case results from the solicitation letter dated September 29, 1982, covering a performance period from April 1, 1983, through September 30, 1983. At issue are the Class 3 rates filed by plaintiff for Volume 46 for seven traffic channels from points in the continental United States to

Korea, designated as: California-North, California-South, Delaware, Illinois, Kentucky, Vermont and Washington. The rates were for movements of unaccompanied baggage in MTMC service denominated as Code 8. In this service, the carrier performs packing and pick up at origin, arranges for transportation to a commercial airport for air movement to the destination airport, arranges for transportation from the airport, and performs unpacking and delivery at destination.

Due to restrictions of the Korean Government, only three carriers, including plaintiff, have been authorized to transport Code 8 shipments to Korea. Historically these carriers have shared such traffic on an equal basis.

The deadline for filing I/F rates for Volume 46 was November 24, 1982, and the deadline for submission of M/T rates was February 10, 1983. During the "Me-Too" cycle for Volume 46, and subsequent to the filing deadline, plaintiff's rates for these seven traffic channels were automatically rejected by the MTMC computer because they were lower than the low rates established for those same channels during the I/F cycle. The MTMC computer is programmed to reject all "Me-Too" rates below the I/F rates as erroneous rates. The Standing Instructions provide for rejection in such event. Plaintiff's filings, for those channels where it had submitted the low I/F rate, were not rejected, and plaintiff is eligible for business on those channels.

In the "Me-Too" cycle of Volume 46, MTMC processed 1,044,678 rates, submitted by 132 forwarders. The MTMC computer automatically rejected approximately 71,749 rates as erroneous. Thirty-three forwarders, in addition to plaintiff, had rates rejected because an M/T rate was less than the I/F low rate.

An error was involved in plaintiff's submission of the M/T rates that were rejected. Plaintiff uses IBM System 34 data processing equipment that employs disk-

ettes; it is not compatible with the data processing equipment used by MTMC. For this reason, plaintiff uses an independent service bureau (DPS) to transfer data to and from the diskettes. Plaintiff's Code 8 rates to Korea during the I/F cycle were transferred from its diskettes to tape by DPS, and the tape was transmitted to MTMC by its computer company, R.D. Simmons Company. MTMC processed the I/F cycle tapes, and prepared a tape that set forth the low rate for each code of service for each country and for each traffic channel. R.D. Simmons Company received this tape from MTMC and prepared a printout for plaintiff showing each low rate set during the I/F cycle. Plaintiff gave the MTMC tape to DPS to transfer the lower rates onto a diskette. During the transfer process, DPS deleted the whole numbers to the right of the decimal point (pennies) for each of the low Code 8 rates for a number of countries, including Korea, *i.e.*, a low rate of $144.50 was converted to $144.00. DPS, in this transfer, apparently used an incorrect "block length" or "record length," or otherwise instructed deletion of numbers to the right of the decimal point that appeared on the MTMC tape. Plaintiff prepared its M/T filing from a printout made from the diskette prepared by DPS. In attempting to equalize the I/F low rates, plaintiff filed "Me-Too" rates that did not contain pennies, and consequently were lower than the I/F low rates.

Plaintiff learned its rates had been rejected when it received the MTMC printout on February 25, 1983. On March 14, 1983, plaintiff met with MTMC officials and requested permission to correct its erroneous rates. MTMC denied this request.

### DISPOSITION

■ In its cross-motion for summary judgment, plaintiff seeks a declaratory judgment or equitable and extraordinary relief, as authorized by 28 U.S.C. § 1491(a)(3) (Supp. V, 1981).[2] The authori-

---

**2.** Section 133(a)(3) of the Federal Courts Improvement Act of 1982. Pub.L. No. 97–164, 97th Cong., 96 Stat. 25, 40 (1982).

ty of the court under this section applies only to "any contract claim brought before the contract is awarded." The Claims Court lacks jurisdiction to grant equitable relief pursuant to section 1491(a)(3) in a suit that is not a contract claim or if it is brought after a contract has been awarded.[3]

This case involves a contract claim, and the jurisdiction of this court under section 1491(a)(3), was invoked by plaintiff's complaint when it was filed on March 16, 1983. Defendant, through MTMC, has created a program in which there is an implied-in-fact agreement that the forwarders, on compliance with the solicitation letter and the Standing Instructions, will be awarded such contracts as may be available for transportation services under the terms so established.

The ITGBL program establishes an ongoing contractual relationship in which plaintiff has participated since 1972. In the program, MTMC is responsible for the establishment of rates, terms and conditions for freight transportation services that are to be incorporated in separate independent contracts subsequently awarded by the ITOs. To this end, MTMC solicits rate proposals (generally twice a year) from eligible freight forwarders to be used during a subsequent 6-month performance period. The rates filed by the forwarders in compliance with the solicitation letter and the Standing Instructions, when they are certified to the ITOs, are final for contracts for transportation services to be awarded by the ITOs during the performance period. The final date for rate certification statements for Volume 46 was March 17, 1983, and the performance period began on April 1, 1983. MTMC's rejection of plaintiff's rates for seven of the traffic channels to Korea pre-cludes the possibility that plaintiff can obtain contracts for business in those channels at the I/F low rates.[4]

■ The fact that plaintiff has been a participant in the MTMC procedures since 1972 does not render the Volume 46 transaction a post-award contract situation that precludes equitable relief under section 1491(a)(3). MTMC's periodic solicitations constitute successive contractual arrangements, plaintiff's filings for Volume 46 applied to future contracts to be awarded after April 1, 1983.

On March 16, 1983, plaintiff had a "contract claim" under section 1491(a)(3) on the basis of the implied-in-fact contract that MTMC would consider the filing fairly and impartially in accordance with the procedures established for the ITGBL program.[5] When plaintiff filed its complaint on March 16, 1983, the performance period had not commenced. Accordingly, on that date, the jurisdiction of this court attached.

This court recently has ruled that, even if a suit has been timely filed to enjoin award in a contract claim, the Claims Court loses jurisdiction to exercise the equitable powers set forth in 28 U.S.C. § 1491(a)(3) once the contract is awarded.[6] This court believes these decisions are erroneous and respectfully declines to follow them. No decision of the Supreme Court or of the Federal Circuit requires this court to be divested of its jurisdiction by defendant's award of the contract. The Federal Circuit in *Grimberg* held only that the equitable power set forth in section 1491(a)(3) is restricted to complaints filed in this court before the award of the subject contract. *Grimberg* did not decide that this court's power to grant injunctive relief cannot be exercised beyond

---

**3.** *United States v. John C. Grimberg Co.*, 702 F.2d 1362 (C.A.Fed.1983).

**4.** The program does not guarantee any particular amount of business. During the performance period, a particular ITO may or may not issue GBLs for transportation services.

**5.** *Keco Industries, Inc. v. United States*, 192 Ct.Cl. 773, 428 F.2d 1233 (Ct.Cl.1970).

**6.** *Alderete General Contractors, Inc. v. United States*, 2 Cl.Ct. 184, 6 USCCR No. 3 (1983) (MEROW, J.); *Big Bud Tractors, Inc. v. United States*, 2 Cl.Ct. 195, 6 USCCR No. 13 (1983) (KOZINSKI, C.J.).

the pre-award stage of the procurement process.[7]

This court's equitable jurisdiction in contract cases is conferred by Congress in section 1491(a)(3). The judicial task in delineating the scope of the court's jurisdiction is to give effect to the intention of Congress. The "lodestar" is the language of the statute.[8]

Section 1491(a)(3) by its terms manifests no Congressional intention that the court's jurisdiction conferred in that section is to be limited by a subsequent contract award. There is no suggestion that the limited grant of equitable jurisdiction is to be subject to subsequent ouster. Section 1491(a)(3) authorizes the court "to afford complete relief" on any contract claim "brought" before the contract is awarded. No provision in the statute withdraws the equitable jurisdiction granted.

■ It has long been the rule of the federal courts that jurisdiction is determined at the time the suit is filed and is not subject to manipulation by subsequent events.[9] The jurisdiction of this court depends upon the state of things at the time the action is brought; after vesting, it cannot be ousted by subsequent events. Had Congress intended to change this long standing rule, it would have made such an intention clear when it enacted section 1491(a)(3).

Section 1491(a)(3) applies to contract claims "brought" before the contract is awarded. This language accords with the standard rule and negates any construction that would have Congress intend the provision to read as though it said "brought and decided" before the contract is awarded.

■ The authority to grant injunctive relief of necessity implies the power to prohibit action that would defeat the power of the court to issue an injunction. The mere pendency of a suit for an injunction, prior to issuance of a decree, gives the court the authority to maintain the *status quo,* until the case is decided. An action taken by a party to render moot the issue to be decided will not defeat the jurisdiction of the court.[10]

The section 1491(a)(3) grant of equitable powers is prefaced by an expression that the grant thereof is intended to allow the court "to afford complete relief" to a claimant. The grant of equitable power was intended to reform the prior jurisdictional structure that could require a claimant to bring a suit in district court and a suit in the Court of Claims in a case in which both injunctive and monetary relief is sought.

---

7. *See Systems Architects, Inc. v. United States,* 2 Cl.Ct. 456, 460, n. 8 (1983) (NETTESHEIM, J.).

8. *United States v. Erika, Inc.,* 456 U.S. 201, 206, 102 S.Ct. 1650, 1653, 72 L.Ed.2d 12 (1982).

9. *Mullen v. Torrance,* 22 U.S. (9 Wheat.) 237, 238, 6 L.Ed. 154 (1824) (change of domicile does not affect diversity jurisdiction); *St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 293, 58 S.Ct. 586, 592, 82 L.Ed. 845 (1938) (district courts are not ousted of jurisdiction by subsequent events reducing the amount recoverable on plaintiff's claim below the jurisdictional amount); *Rosado v. Wyman,* 397 U.S. 397, 402–05, 90 S.Ct. 1207, 1212–1214, 25 L.Ed.2d 442 (1970) (federal court retains jurisdiction of pendant state claims after federal claim is dismissed for mootness); *Hurn v. Oursler,* 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933); *Hill v. Rolleri,* 615 F.2d 886 (9th Cir.1980); *Dery v. Wyer,* 265 F.2d 804 (2nd Cir.1959) (where federal jurisdiction over third-party claim existed by reason of diversity when trial began, it survived settlement of main action upon which diversity jurisdiction depended); *Craft v. United States,* 589 F.2d 1057 (Ct. Cl.1978); 21 C.J.S. *Courts* § 93 (1940); 36 C.J.S. *Federal Courts* § 26 (1960).

10. *Porter v. Lee,* 328 U.S. 246, 251, 66 S.Ct. 1096, 1099, 90 L.Ed. 1199 (1946). The court stated:

"It has long been established that where a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may by mandatory injunction restore the *status quo.*"

In *Jones v. S.E.C.,* 298 U.S. 1, 17–18, 56 S.Ct. 654, 658–659, 80 L.Ed. 1015 (1936), the court stated:

"The conclusion to be drawn from all the cases is that after a defendant has been notified of the pendency of a suit seeking an injunction against him, even though a temporary injunction be not granted, he acts at his peril and subject to the power of the court to restore the status, wholly irrespective of the merits as they may be ultimately decided."

The ability of the court "to afford complete relief" to a claimant obviates "costly duplication in litigation." The statute would be illusory if the jurisdiction of this court could be ousted on the contracting officer's decision to award the contract involved.

■ This court finds no Congressional intention to alter the well settled rule that jurisdiction is to be determined at the time an action is commenced. Accordingly, it is held that jurisdiction in this case, having properly vested under section 1491(a)(3), has not been defeated by entry into the performance period for Volume 46, and the subsequent award of contracts thereunder.

■ Plaintiff seeks an order that directs defendant to allow correction of the errors made in the seven Code 8 rates to Korea that have been rejected in the M/T filing procedure, on the ground that defendant's refusal is arbitrary, capricious, an abuse of discretion, and inequitable. This request is supported by citation to cases in which the Court of Claims allowed reformation of a contract when the contracting officer had actual or constructive knowledge of errors in a bid.[11] These cases, which were based upon the Court of Claims Tucker Act jurisdiction and not upon the powers provided in 28 U.S.C. § 1491(a)(3), concerned fact situa-

tions that involved over-reaching by the procuring agency, and resulting undue hardship to the contractor. Here, the fact situation is entirely different. MTMC cannot be charged with overreaching to take unfair advantage of plaintiff; MTMC has rejected and refused to consider plaintiff's bid as to the seven channels. There is no contract to be reformed, and the case law relative to reformation because of mistake cannot be extended to plaintiff's fact situation.

■ To activate the equitable power of the court under section 1491(a)(3), plaintiff must show there is no rational basis for MTMC's continued rejection of its M/T filings.[12] This standard accords with the arbitrary and capricious criteria enunciated by the Court of Claims in bid protest cases brought after award of the contract, which could be shown by proof of (1) subjective bad faith, (2) lack of a reasonable basis for the Government's action, or (3) violation of relevant statutes and regulations.[13]

■ The issue, therefore, becomes whether the limitation in section 3003 of the Standing Instructions in the ITGBL program (that restricts relief after the rate filing deadline to withdrawal of the erroneous rate) has a rational basis.[14] The Stand-

---

11. *Chernick v. United States,* 178 Ct.Cl. 498, 372 F.2d 492 (Ct.Cl.1967); *Chris Berg, Inc. v. United States,* 426 F.2d 314 (Ct.Cl.1970); *Jones & Sears, Inc. v. United States,* 158 Ct.Cl. 162 (1962).

12. *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971); *Baird Corp. v. United States,* 1 Cl.Ct. 662 (1983) (LYDON, J.); *P. Francini & Co. v. United States,* 2 Cl.Ct. 7 (1983) (WHITE, J.).

13. *Keco Industries, Inc. v. United States,* 492 F.2d 1200 (Ct.Cl.1974) (Keco II).

14. Section 3003 of the Standing Instructions provides:
"3003. *Mistake in Rate Filing Procedures.*
"a. *General.* Carriers are afforded the opportunity to review I/F and M/T rates and to provide full and complete evidence which will support allegations of errors in constructing and/or submitting rates. * * * Relief for MIRF may be granted only after the carrier has through *clear and convincing* evidence established the existence of the particular mistake

alleged and only under the procedures indicated below.
  *   *   *   *   *   *
"(3) *MTMC Decision for Relief.* MTMC will evaluate documentation submitted and will notify carriers of its decision. MTMC will administratively consider only withdrawal—not correction—of mistakes. Also, when relief is authorized, the rates concerned will be invalidated for the life of the rate volume. * * *
  *   *   *   *   *   *
"(b) *M/T Filing.* MIRF procedures are primarily intended to eliminate unsupportable low rates established at the I/F level and to subsequently protect carriers from financial loss and to protect the Government from potential service failures resulting therefrom. Carriers alleging errors in the M/T rate submission may do so within 14 calendar days (or the next Federal workday if the 14th day occurs on a Federal nonworkday) from the date MTMC distributes M/T Accepted Rate Certification Printouts following the same procedures for supporting documentation applicable to I/F MIRF. Telephonic notification *must* be made as soon

ing Instructions and the solicitation letter establish the procedures that apply to the ITGBL program.[15] They are tantamount to regulations and are part of the implied-in-fact contract involved in this case.[16]

Plaintiff does not deny that the Standing Instructions are tantamount to regulations in the MTMC procedures. Further, plaintiff does not allege bad faith at MTMC or a violation of relevant statutes or regulations. Plaintiff claims section 1004 of the Standing Instructions authorizes MTMC to permit correction of bid errors, and its failure to utilize this authority is arbitrary and capricious.[17]

██ The Standing Instructions provide a procedure for administration of a large and complex program that involves the submission of over four million rates by over 130 forwarders annually. Over one million separate rates are submitted to MTMC during each of the two cycles in each solicitation. Rates are solicited and established at 6-month intervals, which requires close

scheduling to solicit, receive, and evaluate all of the rates for each volume. The Standing Instructions permit forwarders to submit as many corrected tapes as they desire prior to the filing deadlines for rate submissions. Relief for erroneous rates discovered after the filing deadline, however, is limited to withdrawal of an erroneous rate that otherwise would be accepted. The procedures specifically warns that errors that result from violation of the filing system parameters, such as filing an M/T rate below the low rate established in the I/F cycle, cannot be corrected. In view of the magnitude of the program, this procedure as a whole cannot be held to be irrational or unreasonable.

Plaintiff's reliance on section 1004 of the Standing Instructions is misplaced. MTMC has never used this section to permit correction of errors in rates after the filing deadline. This section obviously is drafted for the benefit of MTMC in dealing with extra-

as feasible after discovery. However, telephonic notification in no way relieves the carrier from responsibilities to support the allegations in writing. MTMC will evaluate these cases and will deny or grant relief based on the 'clear and convincing evidence' criteria. M/T rates for carrier's denied relief will remain valid for the applicable rate volume minimum period except in those cases where the rate levels are so obviously inconsistent with other filings as to preclude their acceptance. Such rates may be unilaterally deleted by MTMC by withdrawal of approval, for the affected rate cycle for the code(s) of service for the rate area(s) for which the error(s) was made and any approvals that are conditionally dependent upon that code of service (i.e., Code 8 for Code J). *Erroneous rates for which relief is granted will be cancelled for the life of the volume.* MTMC will administratively consider only withdrawal—not correction—of mistakes."

15. The Defense Acquisition Regulations (DAR) expressly exempt from their coverage the procurement at issue. DAR 1–102, 32 C.F.R. 1–102, provides:

"1–102 Applicability of Regulation. This Regulation shall apply to all purchases and contracts made by the Department of Defense, within or outside the United States (but see 1–109.4), for the procurement of supplies or services which obligate appropriated funds (including available contract authorizations), or in support of foreign military sales without regard

to the nature or source of funds obligated, unless otherwise specified herein, except transportation services procured by transportation requests, transportation warrants, bills of lading, and similar transportation forms. Procurement of these excepted transportation services shall be in accordance with specific regulations and instructions issued by the Military Traffic Management and Terminal Service (MTMTS), Military Sealift Command (MSC), Military Airlift Command (MAC), and the Departments."

16. *Cf. Ast/Servo Systems, Inc. v. United States,* 449 F.2d 789 (Ct.Cl.1971).

17. Section 1004 reserves to MTMC the right "to respond to data processing failures." It reads in part:

"1004. *Acceptance of Offers.* MTMC reserves the right to reject any or all offers, to waive informalities and minor irregularities in offers received, to negotiate or accept or reject initial or subsequent submissions without discussion of rates, and to nonuse or cancel any rate upon due notice, and/or resolicit rates. Additionally, MTMC reserves the right, on 15 days notice, to extend the effective period of rates by 45 days to modify the rate filing period; to change the type of rates being solicited; to resolicit rates as the result of Government or carrier actions; to respond to delaying court injunctions; to respond to data processing failures, strikes, embargoes; and other policy/economic situations; and other similar valid reasons."

ordinary situations that involve MTMC's data processing errors. It is not designed for the benefit of forwarders. Plaintiff's interpretation would render sections 3002 and 3003, which deal specifically with bid errors, in conflict or superfluous.

Plaintiff invokes the court's equitable powers under section 1491(a)(3) to overcome what it describes as the harsh and unfair treatment that results from MTMC's procedures. It is clear that plaintiff intended in its M/T filing to equalize the low rate specified in the I/F cycle. Plaintiff's rates, however, were rejected because an error was made.

MTMC in no sense can be held responsible for the error that was made. MTMC was neither aware of the error nor of the rates plaintiff intended to submit, until after the filing deadline. The MTMC computer automatically rejected plaintiff's rates under the procedures. The magnitude of the program precludes review by MTMC officials; MTMC officials could not be expected to warn plaintiff before the filing deadline that its filing was erroneous.

The error was not the result of computer malfunctioning. MTMC provided plaintiff with a printout and a tape that showed the correct low rates in the I/F cycle. The error was made by plaintiff's service bureau (DPS) when it transferred data from the MTMC tape to diskettes used by plaintiff. This does not amount to inadvertent computer error; the diskettes were prepared in accordance with the instructions programmed by DPS.

Further, plaintiff had a printout of the correct low rates in the I/F cycle. The printout plaintiff had from the MTMC tape showed the correct I/F low rates, and designated the channels in which plaintiff's initial filing established the low rate. Plaintiff for example established the low rates for Arkansas and Arizona at $177.67 and $172.50 respectively. The printout from DPS's diskette, however, showed these rates to be $177.00 and $172.00, and all other I/F low rates to be even dollar amounts. Plaintiff had the opportunity and the responsibility to review its own filing and should have been alerted by this situation. If plaintiff had looked at its own bids in the MTMC printout it would have recognized that the diskette printout was in error. In the circumstances, it cannot be said that MTMC's refusal to permit correction of the erroneous rates is arbitrary or capricious. MTMC is not to be expected to act as a nursemaid for careless bidders.

### CONCLUSION

On the basis of the foregoing, defendant's motion for summary judgment is allowed, plaintiff's motion for summary judgment is denied, and the complaint will be dismissed.