**WPC ENTERPRISES, INCORPORATED**

v.

**The UNITED STATES.**

No. 256–59.

United States Court of Claims.
Oct. 11, 1963.
Rehearing Denied Jan. 24, 1964.

Gilbert A. Cuneo, Washington, D. C., for plaintiff. Joseph Sachter, New York City, David N. Barus, Walter D. Matson and Cummings & Sellers, Washington, D. C., of counsel.

Edward L. Metzler, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

DAVIS, Judge.

This is a study in the toils of ambiguity. The parties put their names to a contract which, on the point crucial to this lawsuit, could reasonably be read in two conflicting fashions. Each signatory seized in its own mind upon a different one of these contradictory versions. Compounding that confusion, they discussed the issue with each other in such a way that each thought, but this time without good reason, it had obtained the other's acquiescence in its chosen reading. The impasse became unmistakably plain when it was too late. Our task is to determine on whom should fall the risk of such mutually reinforced obscurity.

The Government set out to procure, through bids, a large number of complex generator sets—called the MD-3 set— used to calibrate the electronic systems of the B-47 and other aircraft and to start the engines when an electric starter is required. Beech Aircraft Corporation, which had previously made these elaborate devices for the Air Force on a negotiated basis, had prepared specifications and drawings of various of the component parts which the Government acquired and incorporated in the bid invitations. Plaintiff [1] was the low bidder, lower than Beech and another company which had also provided the sets under a negotiated contract. After a period of consideration and some discussion, the award was made to plaintiff and it performed the contract as required by the Government.

The only dispute now before us is whether five components of these generator sets had to be manufactured by (or with the authorization of) certain named companies, as the Government urges, or whether plaintiff was entitled under the contract to furnish identical components made by other firms (presumably at lower prices). After the award, defendant insisted that the products of the specified companies had to be furnished. Plaintiff complied but, claiming that this directive constituted a contractual change, sought review by the Board of Contract Appeals under the Changes and Disputes articles. The Board turned down the appeal on the ground that plaintiff had been told before the award of the defendant's position and had acquiesced.

For the five components now involved, the textual provisions of the specifications (borrowed from Beech) gave general descriptions, without naming any manufacturer; however, the drawings (also from Beech) listed the part numbers given to the item by a particular firm and declared that that manufacturer was the "approved source", or that the component "may be purchased" from that company, or indicated "make from" a part furnished by a particular company, or simply said that the component was a certain part number of a specific firm. There are also other, slighter, indications of contractual meaning on which the parties rely; the details are set forth in the findings.

Each side urges that its position is sustained by the invitation as a whole—without any need to go beyond the bounds of the contractual instruments. The defendant stresses the references to specific part numbers, designated by particular

1. The present plaintiff is the successor of International Fermont Machinery Co., Inc., which placed the bid and to which the award was made. Defendant asserts that there is insufficient proof that plaintiff acquired all the assets of Fermont (which was then dissolved) but, in the absence of any reason to doubt the affidavits offered by plaintiff, we accept (at the present stage of the case) those statements as adequate. See finding 2, footnotes 8 and 9. Although Fermont was in reality the contractor, we shall refer to plaintiff as such.

fabricators, as necessarily showing that only parts made under the aegis of that manufacturer would be acceptable; this use of exact part numbers is said to be equivalent to a mandatory direction to incorporate only those very items. Defendant also points out that: (i) the drawings and specifications for the five components were not adequate for a new manufacturer to make those articles in the relatively short time allotted for completion of the procurement; (ii) the defendant was satisfied with components made from parts supplied by the named manufacturers (because they had been fully tested in the past), but would be required before acceptance to test components made by others; and (iii) this burdensome and time-consuming testing would not be practicable within the scheduled period of delivery. It should have been clear, defendant concludes, that the contract called for items supplied by or through the specific companies named in the drawings. (Defendant's witnesses testified to this effect before the Board and at the trial in this court.)

The plaintiff, on the other hand, emphasizes the lack of express mandatory language in the references to particular manufacturers for the five disputed components—in contrast to certain other components which the specifications very plainly declared "shall be" or "shall consist of" an identified part made by a named manufacturer. A command to use only materials or elements made by a specific firm is not frequent in government procurement; it can be expected to be phrased explicitly and not left to inference. Moreover, the references to particular part numbers are not read as mandatory because of a specification provision (labeled "Identification of Parts") which stated:

"Beech and vendor part numbers will be shown on all items except those items supplied by other than Beech Aircraft Corporation or vendors to Beech. On items supplied by other than present sources Beech part numbers will be used with a suffix to indicate a different supplier."

To plaintiff, this clause implicitly authorized the use of identical components made by other companies than those named in the Beech drawings. It thought that it could obtain such qualified substitutes by combining the knowledge gained from three sources: the drawings and specifications (insufficient though they might be); a careful break-down of the sample models supplied plaintiff by the defendant; and general engineering competence. Plaintiff was satisfied that the proper components could be produced in this way within the time allowed. (The contractor's position was likewise supported by evidence before the Board of Contract Appeals.)

■ This summary of the opposing contentions is enough to show that no sure guide to the solution of the problem can be found within the four corners of the contractual documents. As with so many other agreements, there is something for each party and no ready answer can be drawn from the texts alone. Both plaintiff's and defendant's interpretations lie within the zone of reasonableness; neither appears to rest on an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap; the arguments, rather, are quite closely in balance. It is precisely to this type of contract that this court has applied the rule that if some substantive provision of a government-drawn agreement is fairly susceptible of a certain construction and the contractor actually and reasonably so construes it, in the course of bidding or performance, that is the interpretation which will be adopted—unless the parties' intention is otherwise affirmatively revealed. Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390, 418 (1947); First-Citizens Bank & Trust Co. v. United States, 76 F.Supp. 250, 266, 110 Ct.Cl. 280, 310 (1948); Western Contracting Corp. v. United States 144 Ct.Cl. 318, 326 (1958); W. H. Edwards Eng'r. Corp. v. United States, Ct.Cl. No. 218–59, decided April 5, 1963, slip op. pp. 9–10; Freed-

man v. United States, Ct.Cl., 320 F.2d 359, 365. This rule is fair both to the drafters and to those who are required to accept or reject the contract as proffered, without haggling. Although the potential contractor may have some duty to inquire about a major patent discrepancy, or obvious omission, or a drastic conflict in provisions (see Consolidated Eng'r. Co. v. United States, 98 Ct.Cl. 256, 280 (1943); Ring Constr. Corp. v. United States, 162 F.Supp. 190, 192, 142 Ct.Cl. 731, 734 (1958); Jefferson Constr. Co. v. United States, 151 Ct.Cl. 75, 89–91 (1960)), he is not normally required (absent a clear warning in the contract) to seek clarification of any and all ambiguities, doubts, or possible differences in interpretation. The Government, as the author, has to shoulder the major task of seeing that within the zone of reasonableness the words of the agreement communicate the proper notions—as well as the main risk of a failure to carry that responsibility. If the defendant chafes under the continued application of this check, it can obtain a looser rein by a more meticulous writing of its contracts and especially of the specifications.[2] Or it can shift the burden of ambiguity (to some extent) by inserting provisions in the contract clearly calling upon possible contractors aware of a problem-in-interpretation to seek an explanation before bidding. See Beacon Constr. Co. of Mass. v. United States, Ct.Cl., 314 F.2d 501, 504; Guyler v. United States, Ct.Cl., 314 F.2d 506, 510–511 (concurring opinion).

If there were nothing more, the case would end here with a ruling for the plaintiff. But the defendant argues, and the Board of Contract Appeals found, that before the award was made or the contract signed the plaintiff learned the Government's view of the disputed point and accepted that position.[3] The Board rested its decision on two meetings between the parties, after the bids but prior to the award. At the first (on December 19, 1956), the contractor's only representative was Cecil Sugarman, its sales manager who had had no part in the preparation of the bid and had no actual authority to commit the plaintiff; on the basis of the evidence of the Government representatives (Sugarman did not testify at that stage) the Board found it had been made clear to the contractor that only components (including the five in question) from the named manufacturers would be acceptable and that the contractor so understood and agreed. The Board also relied somewhat on a later conference (January 3, 1957) at plaintiff's plant at which defendant's people met with Mr. Rohr, the vice-president concerned with this procurement, and a few others from plaintiff's side.[4] If the Board's determination that plaintiff was told of (and acquiesced in) defendant's position is binding on or accepted by us, the tables would be turned. The initial ambiguity in the specifications would have been authoritatively resolved before the contract was made; plaintiff would have voluntarily agreed, at a time when it could have (in effect) withdrawn its bid,[5] to the Government's reading of the terms of the transaction.

■ There are a number of subsidiary questions, some harder than the rest, entangled in the issue of whether we should

2. It was a clear mistake to borrow the Beech specifications and drawings for the Government's procurement without more editorial revision and adaptation. Those specifications and drawings were tailored to manufacture and procurement by Beech, a private concern—not by the United States. The trouble came about because the defendant's contracting officials failed to modify the documents, which may have been adequate for a private procurement, so as to make them entirely suitable for a public procurement through bidding.

3. The Board of Contract Appeals did not reach, or make any observations on, the issue of what would have been the proper interpretation of the contract if the plaintiff had not acquiesced in the Govment's construction.

4. The circumstances of the two meetings are elaborated in findings 16–18.

5. After the conferences of December 19, 1956, and January 3, 1957, plaintiff twice extended the defendant's time within which to consider whether to accept plaintiff's bid.

or must ratify the Board's findings. The defendant now says that we are barred by United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), from paying any attention to the additional evidence which was presented by both sides at the trial in this court and must confine ourselves to the record before the Board. But the defendant made no objection to the receipt of such *de novo* evidence, nor did it seek to raise or preserve this point until the oral argument. As we recently held in Stein Bros. Mfg. Co. v. United States, Ct.Cl., No. 389–59, decided July 12, 1963, slip op., pp. 2–4, in such a case the Bianchi issue has been waived. See, also, United States v. L. A. Tucker Truck Lines, 344 U.S. 33, 36–38, 73 S.Ct. 67, 97 L.Ed. 54 (1952); North American Airlines v. Civil Aeronautics Board, 240 F.2d 867, 874 (C.A.D.C., 1956), cert. denied, 353 U.S. 941, 77 S.Ct. 815, 1 L.Ed.2d 760 (1957); Adams v. Witmer, 271 F.2d 29, 36–37 (C.A.9, 1958). We are therefore free to take account of the new evidence along with the old.[6]

■ Another question is whether an administrative determination of this character is entitled in court to any special weight under the Bianchi ruling and the Wunderlich Act, 41 U.S.C. §§ 321, 322, even if reasonable and supported by substantial evidence. The holding that plaintiff acquiesced in the Government's interpretation, though a "factual" finding in one sense, is intimately related to the legal question of what was the contract the parties made between themselves; under the Act, all legal questions are to be resolved independently by the court, and under our prior decisions subordinate "factual" findings akin to those made here are wholly subsumed in the larger legal problem of contract interpretation. See, also, Blake Construction Co. v. United States, 111 U.S.App.D.C. 271, 296 F.2d 393, 396–397 (1961). That is a problem which we shall doubtless have to meet again in other cases. For the present, we can pretermit it—as we

did in Stein Bros. Mfg. Co. v. United States, supra, slip op., p. 2. On consideration of the record before the Board and in this court, we have concluded that, even if the Board's findings are fully treated as factual, they are not final under the Act because they lack substantial support in the record as a whole.

■ At the trial in this court, Commissioner McConnaughey had the benefit, with respect to the pre-award meetings between the parties, of testimony by Sugarman (who did not appear before the Board) and of other representatives of both sides, as well as of certain documentary materials (notably an internal memorandum by a Government contracting official made after the December 19, 1956 meeting with Sugarman). He also had the evidence before the Board. The Commissioner concluded on the basis of the entire record that there was no substantial support for either of the Board's double findings: (a) that at the December conference Sugarman acquiesced, actually or apparently, in the defendant's interpretation of those provisions of the invitation that relate to the five components, or that defendant's officials had reason to think he had so acquiesced; and (b) that this acquiescence was confirmed and reinforced at the meeting of January 3, 1957. We agree with and adopt these conclusions of the Commissioner; the underlying facts are set forth in findings 16, 17, 18 and 25. Taking the two meetings together, it is plain that the defendant expressed a general view as to the source of components, but there is no adequate ground for deciding that plaintiff submitted or assented with regard to the five in dispute. The result is that, assuming it to be covered by the finality provision of the Wunderlich Act, the Board's adverse decision is nevertheless deprived of finality for failure to comply with the statutory criteria.

■ Unconstrained by the administrative determination, we can make our own findings, from the whole record, on the issue of acceptance by one side of the

6. The evidence before the Board of Contract Appeals is part of the record in this court.

other's view. See United States v. Carlo Bianchi & Co., supra, 373 U.S. 709, 717, 83 S.Ct. 1409, 10 L.Ed.2d 652.[7] Here, too, we agree with the Trial Commissioner that (i) both parties became aware of the other's interpretation; (ii) neither acquiesced knowingly in the other's interpretation; (iii) both thought, however, that the other had acquiesced; (iv) without either having reasonable grounds for so thinking; and, finally, that (v) neither took the proper steps to clarify the pertinent terms of the transaction until after the award was made. On both sides ambiguous utterance was piled on unwarranted assumption and laced together by unspoken premise. In the end, the Government officials thought they had made it quite clear that the named manufacturers would have to be used for all components, while the plaintiff's people felt that they had successfully stood their ground at least as to these five components. Both were wholly wrong in their understanding of the other's understanding. The discussions had been one prolonged minuet of cross-purposes.

■ In these circumstances should the onus of the original ambiguity in the specifications still rest on the defendant? We can see no other conclusion. As the author of the defect in the drafting which led plaintiff to the reasonable supposition that it could obtain the five components elsewhere than from the named companies, the Government was under the affirmative obligation (if it wished its own view to prevail) to clarify the meaning of the contract in definitive fashion before the plaintiff was bound. It did make such an attempt, and it did reveal its own view. But when the plaintiff demurred the Government did not adequately indicate that it stood steadfast by its announced opinion. There was a fatal insufficiency in the defendant's effort to communicate to plaintiff that the contract was to be interpreted as the Government understood it. Largely because of this lapse, the plaintiff was left with the mistaken impression that the defendant, rather than insisting, would accept plaintiff's rendering of the contract. The Government, in a word, was very lax in seeing the matter through. Since the burden of clarification was the defendant's, it must bear the risk of an insufficient attempt, even though the plaintiff's obtuseness likewise contributed to the continuance of the misunderstanding. If there had been no communication by defendant to plaintiff between the receipt of the bids and the making of the award, the defendant would have had to suffer the consequences of its poorly drafted specifications. The ineffective attempt to put things right does not place the defendant in a better position. Only an adequate effort to reach the plaintiff's mind could have that result.

■ Two objections may be made to our taking this ground. The inconclusive discussions between the parties show, it may be said, that there was no "meeting of the minds" on the issue which concerns us, and therefore no valid contract. There was no subjective coming-together, it is true, but an enforceable agreement came into being nevertheless. The design of the contract can be picked from the terms and words of the invitation, objectively read with the aid of rules of contract construction (which are distillates of the common experience and the common sense of justice). It is a normal characteristic of the class of cases in which the courts have held ambiguities against the drafter that the parties' minds have failed to meet on the specific point in dispute. That gap has not been permitted to swallow the whole contract except perhaps where the gulf is far closer to the bounds of the entire consensual perimeter than here. For a contract to exist there does not have to be, and rarely is, a subjective "meeting of the minds" all along the line. See Corbin, Contracts, §§ 95, 106, 546, 559.

---

7. As explained above, we can consider the judicial as well as the administrative record in this case because the defendant did not object at the trial to the receipt of the *de novo* evidence.

The other objection is that the plaintiff is bound by the opposing view of the contract because it twice extended the defendant's time to make the award (on February 8 and 18, 1957) after the Air Force's representatives had told plaintiff of their attitude. This contention must be rejected for the reason given above. Although it had the burden, the defendant simply did not make it clear enough that it stood by its position despite the plaintiff's disagreement. When the latter extended the time for the award it did not comprehend that the Government was insisting on its own construction. This state of affairs was attributable, in substantial measure, to defects in the defendant's course of communication to plaintiff on the subject of the source of the five components. Plaintiff was also at fault, but the risk of a failure to clarify lay largely upon the Government and could have been averted only by a more sufficient effort than was made.

We hold, therefore, that the defendant was wrong in demanding that only products of (or authorized by) the named manufacturers could be used for the five components. The contract did not so require. The issue of the amount of damages or recovery has not been tried and we are not called upon to pass upon any aspects of that question. We leave all such problems to the trial under Rule 38 (c), including the issue of which party has the burden of showing that the components plaintiff planned to use would or would not have been available, and would or would not have qualified under this contract.

The plaintiff is entitled to recover and judgment is entered to that effect. The amount of recovery will be determined under Rule 38(c).