**AABCO, INCORPORATED**

v.

**The UNITED STATES.**

**No. 411–83C.**

United States Claims Court.

July 11, 1983.

Mark J. Andrews, Washington, D.C., for plaintiff; Ronald B. Natalie and Verner, Liipfert, Bernhard and McPherson, Washington, D.C., of counsel.

Helene Goldberg, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

YOCK, Judge.

This contract case involves the issue of whether freight rates filed by the plaintiff with the Military Traffic Management Command (MTMC) were validly rejected as unresponsive bids to the defendant's Solicitation for Rates.

On June 22, 1983 at 2:30 p.m., the plaintiff filed a complaint for declaratory judgment, injunctive relief and other relief, together with motions for a temporary restraining order and a preliminary injunction. The motion for temporary restraint requested action by 3:00 p.m. of that same date enjoining the defendant from (1) requiring AABCO to certify at 3:00 p.m. that the 677 rates accepted by the Military Traffic Management Command (MTMC) completely and accurately reflect the rates submitted by AABCO and (2) publishing a low rate or printout on or about July 11, 1983, without including therein the 1,895 rejected rates filed by AABCO. After a brief telephone conference with counsel for the parties, a TRO was ordered. The defendant thereafter filed its Motion for Summary Judgment and Dissolution of the Temporary Restraining Order on June 24, 1983. On June 27, 1983, the plaintiff filed its response to the defendant's Motion and its Cross-Motion for Summary Judgment.

The parties agreed to a hearing which was scheduled for 2:00 p.m. on June 27, 1983. The hearing was held and lasted until 3:10 p.m. on June 28, 1983, after which the parties agreed that the matter was fully aired and requested a decision on the merits of the controversy. Post-trial briefing followed and the judge on his own motion extended the temporary restraining order another 10 days to expire on July 11, 1983.

For the reasons discussed herein, the plaintiff's Cross-Motion for Summary Judgment is granted with appropriate permanent injunctive relief as indicated, and the defendant's Motion for Summary Judgment is denied.

### Facts

The plaintiff, AABCO Inc., is a regulated freight forwarder of used household goods and unaccompanied baggage pursuant to Permit No. FF–556 issued by the Interstate Commerce Commission, and it also complies with regulations of the Civil Aeronautics Board governing air freight forwarders. As such, plaintiff participates in the Department of Defense (DOD) procurement program for the transportation of used household goods and unaccompanied baggage belonging to armed services personnel and dependents between points within the United States and overseas. Freight forwarders submit rates for the shipment of this personal property under Government Bills of Lading (GBL). This program is referred to as the International Through Government Bill of Lading (ITGBL) program.

The Army's Military Traffic Management Command (MTMC) is charged with responsibility for directing, controlling, and supervising all functions incident to the procurement of freight transportation for DOD components, including the ITGBL program.[1]

The responsibility for soliciting rates and establishing business terms and conditions is centralized in MTMC. Thus, while individual GBL shipments are arranged by some 298 military Installation Transportation Offices (ITO) worldwide, the rates, terms and conditions utilized in those transactions are established by MTMC.

Under the ITGBL program, approximately 150 DOD approved freight forwarders, including plaintiff, file rates with MTMC every six months in order to complete for these international shipments of personal property. These rates are "single factor" rates in that they include the full charges for pick up, packing, line haul, port services, over-ocean movement, delivery to residence, and unpacking.

The ITGBL program is specifically exempted from coverage under the Defense Acquisition Regulations. See 32 C.F.R. 1–102 (DAR § 1–102). Forwarders filing rates in response to solicitation letters must do so in compliance with the particular rate solicitation letter and MTMC's Standing ITGBL Rate Filing Instructions and Proce-

---

1. See DOD Directive 5160.53 published at 32 Fed.Reg. 6,295 (Apr. 21, 1967); 32 C.F.R. § 123.1–.4 (1978).

dures (Standing Instructions). The Standing Instructions are tantamount to regulations and form a part of the implied-in-fact contract involved herein. *Dean Forwarding Co. v. United States,* 2 Cl.Ct. 559 (1983) (HARKINS, J.).

The Standing Instructions establish the following three classes of rates: "Class 1" rates are competitive filings where all traffic (GBL shipments) in a particular "channel" (*i.e.,* from a specific point of origin to a specific destination point) is given to the forwarder submitting the lowest rate. "Class 2" rates are competitive filings where less than 100 percent of the traffic in a channel goes to the forwarder with the low rate and other forwarders are allowed to "Me-Too" and share in the residual traffic. "Class 3" rates are also competitive filings where, regardless of which competitor sets the low rate, other forwarders may share equally in the traffic if they "Me-Too" or equalize that low rate.

MTMC solicits ITGBL freight rates twice a year, by means of a solicitation letter,[2] for six month performance periods known as "Volumes." This dispute concerns Volume 47, covering the period from October 1, 1983 through March 31, 1984. Each solicitation contains two procedural cycles: the "Initial Filing" cycle (I/F), in which forwarders compete to set the low rate for each channel, and a subsequent "Me-Too" (M/T) cycle in which forwarders that did not set the low rate for a particular channel may adjust their rates to meet the low rate, *i.e.,* "Me-Too" the rate, and share equally in the traffic. Typically, over one million separate rates are submitted by the forwarders to MTMC for each cycle of each "volume" on computer readable magnetic tape. These magnetic tapes are then entered into the MTMC computer which evaluates and reduces these rates to a printout which can be utilized by MTMC and the various ITOs.

At issue in this action are the Class 1 and 2 rates filed by plaintiff for Volume 47 for 1,883 traffic channels.[3] On May 25, 1983, the I/F filing deadline, plaintiff submitted to MTMC its coded magnetic tape and a computer printout which duplicated its submitted rates. When the tapes were run on the MTMC computer some time after May 25, 1983, the computer rejected 1,883 of the 2,572 rates submitted by the plaintiff for failing to include "leading zeros" in those rates filed which were under $100.00, for any transportation channel, *e.g.,* 09889 for $98.89.

Prior to the instant submission, plaintiff had employed, as did almost all other carriers, one of the three computer service companies which are familiar with MTMC and its rate filing instructions. These computer service companies would take the rate input from the forwarders and place the rates on the appropriate magnetic tape. Thus, many forwarders' rates were contained on one submitted tape. However, because plaintiff experienced accuracy and timing problems with his service company, and in order to cut his costs, plaintiff determined that for Volume 47, it would employ its own computer programmer and submit its own rate tape.[4] Although Mr. Robert Acker-

---

2. The pertinent solicitation letter for the instant case was dated April 13, 1983. Enclosure one of the letter specified the required deadlines for submission of the industries' "Initial Filing" (I/F) bids as follows:

| | | |
|---|---|---|
| Deadline for I/F of Magnetic Tape and Self-Certification Statement | Industry | 25 May |
| Distribute I/F Carrier Accepted and Selected Rate Printouts | MTMC | 07 June |
| Deadline for Return of I/F Carrier Accepted Rate Certification Page and Documentation Supporting I/F Mistake in Rate Filing (MIRF) | Industry | 22 June |
| Distribute I/F Low Rate Tapes to Industry | MTMC | 11 July |

3. Plaintiff does not contest the rejection of 12 of its rates which were coded to the wrong location, bringing the total number of rejected bids to 1,895.

4. Plaintiff is a small business with four employees that has established an exemplary record of service. It is noted that 10 U.S.C. § 2301 declares the policy of Congress that a fair proportion of the purchases and contracts made under the Armed Services Procurement Act be placed with small business concerns.

man, plaintiff's computer programmer had never submitted a rate tape to MTMC before, he had several years of programming experience in the freight forwarding industry and had computer experience in the military. The plaintiff's president, Mr. Charles Magness, had utilized him on several programming projects and was confident that Mr. Ackerman would prepare and submit the tape in accordance with the MTMC Standing Instructions. After reviewing the Standing Instructions, Mr. Ackerman determined that leading blanks were required when filing rates of under $100.00, *i.e.,* ___9889 for $98.89 (underline added where blank is to be noted). He based this view on the Standing Instructions. He thus prepared plaintiff's tape using no lead zeros on those channels where the bid was below $100.00. This resulted in the 73 percent rejection rate by the MTMC computer (1,883 rates) for plaintiff's I/F rates.

Upon learning of the rejected rates on or about June 8, 1983, Mr. John Sullivan,[5] AABCO's Executive Vice President contacted MTMC officials to try and obtain administrative relief.[6] Mr. Sullivan initially contacted Mrs. Ethe Anderson who had already discussed the plaintiff's problem with several other MTMC officials. Mrs. N. King, supervisor of the international section, had told Mrs. Anderson that plaintiff's only remedy was in the Mistake in Rate Filing Procedures (MIRF). Knowing that these procedures only applied to accepted, rather than rejected rates, Mr. Sullivan contacted Lt. Col. Mason, an MTMC official, who informed him that no decision had been made and that he would contact plaintiff. Mr. Sullivan called back on June 9. He was told by Lt. Col. Mason to put AABCO's position in writing and that a final decision would be reached in a day or two. Mr. Sullivan immediately brought over to MTMC the plaintiff's written position dated

June 9, 1983, and a new magnetic tape, which included leading zeros.[7]

On June 13, 1983, Mr. Sullivan again contacted MTMC and was told that no decision had been reached. On June 14, Lt. Col. Mason informed plaintiff that a decision would be forthcoming soon, but that it would be unfavorable. Mr. Sullivan then asked for a meeting to discuss this decision. At that meeting, he was told that his request was denied. Finally, on June 16, 1983, Mr. Magness wrote General Durham, the Vice Commander of MTMC, and detailed the reasons for using no lead zeros. The letter concluded:

> Based on the vagueness and inconsistencies in the instructions, the fact that the submission was a minor program irregularity, that no competitive advantage would be gained by AABCO, and that precedent exists for granting relief, it is respectfully requested that the rates previously rejected due to blank data field be accepted. We have provided your staff with a new magnetic tape correcting this irregularity.

On June 21, 1983, General Durham responded by letter to Mr. Magness AABCO the right to file a replacement tape for Volume 47. This injunctive action followed.

*Discussion*

Plaintiff in this injunctive action is seeking an order directing the defendant to accept the 1,883 rates filed that failed to include a lead zero, or in the alternative, allow the plaintiff to file a new tape with the lead zeros inserted. Those rates were rejected by the defendant when plaintiff failed to place a lead zero before its four digit filing rates as allegedly called for by the defendant's Solicitation Letter and Standing Instructions. Plaintiff argues

**5.** Both AABCO's President, Mr. Magness, and Vice President, Mr. Sullivan, were former employees of the MTMC.

**6.** Although there was conflicting testimony as to when and who made the decision on plaintiff's appeal, this Court has resolved these credibility issues as stated herein.

**7.** It should be noted that plaintiff had submitted a printout with its tape on May 25, 1983, indicating the rates it had bid. This printout was in dollars and cents.

that the Standing Instructions were ambiguous on this point, and that in any event, the error, if it was an error, was a minor irregularity that should have been waived. The Standing Instructions, section 1004, do give the defendant the authority to "waive informalities and minor irregularities." Therefore, the plaintiff asks the Court to find that the defendant abused its discretion in not allowing a new tape to be filed, thereby excluding plaintiff's bid from consideration.

Defendant contends that the solicitation was not ambiguous and that the rejection for nonresponsiveness was mandated by a concern for the integrity of the system, both in terms of administrative convenience and the prejudicial effect on the competing bidders. Defendant argues that since the bid was not responsive, this court lacks subject matter jurisdiction over this action under 28 U.S.C. § 1491(a)(3).

### Standards

In order to invoke the recently acquired equitable power of this Court over bid protest controversies contained in 28 U.S.C. § 1491(a)(3), it has been held that the plaintiff must show that the procurement officials had no rational or reasonable basis for their actions. *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir. 1971); *Baird Corp. v. United States,* 1 Cl.Ct. 662, 664 (1983) (LYDON, J.); *Dean Forwarding Co. v. United States,* 2 Cl.Ct. 559 (1983) (HARKINS, J.). That is, the plaintiff must show that the procurement officials were arbitrary or capricious in that they showed bad faith, lack of reasonable basis, or violations of law or regulations. *Keco Industries, Inc. v. United States,* 203 Ct.Cl. 566, 574, 492 F.2d 1200, 1203 (1974). *Baird Corp., supra. Dean Forwarding, supra.* When injunctive relief is sought, because it is a drastic remedy, the bidder must establish its right to such relief by clear and convincing evidence. *Goldammer v. Fay,* 326 F.2d 268, 270 (10th Cir.1964). *Baird Corp., supra.*

### Jurisdiction

This Court has injunctive powers under 28 U.S.C. § 1491(a)(3) in order to afford "complete relief" on contracts within the jurisdiction of this Court under 28 U.S.C. § 1491(a)(1). These injunctive powers are restricted to pre-award controversies. *John C. Grimberg Co. v. United States,* 702 F.2d 1362, 1374 (Fed.Cir.1983). In the instant case, both parties agree that no award has been made on the I/F basic contract, the relevant contract for purposes of section 1491(a)(3). *Grimberg, supra.* Although a computer listing of each bidder's accepted rates for channels has been circulated to the bidders, these rates must be certified as correct by the bidders, adjustments must be made by the Government, and potential appeals by bidders for accepted and rejected rates must be determined before a final award is made. The civilian Deputy Director of Personal Property of MTMC, Mr. Robert Waldman, has indicated that both parties will be bound for Volume 47 on July 11, 1983, when the certified rate printouts are to be circulated. This Court finds that this intervening corrective period indicates that no final award has been made. Therefore, this matter is still pre-award and this Court has the power to award injunctive relief.

Defendant argues that this Court still may lack jurisdiction over this case because plaintiff has no implied contract with the Government if its bid was or is nonresponsive. Defendant acknowledges that this Court has contract jurisdiction over bid protest cases under section 1491(a)(1), but argues that the implied contract upon which that jurisdiction is based can only be created when the bid is responsive to the solicitation, citing *Ingersoll-Rand, Inc. v. United States,* 2 Cl.Ct. 373 (1983) (KOZINSKI, C.J.); *Gibraltar Industries, Inc. v. United States,* 2 Cl.Ct. 589 (1983) (MEROW, J.). In the instant case, the determination of whether plaintiff's bid was responsive was allegedly made by the contracting officer's (CO) functional equivalent in the IGBDL system, although the rejection in fact came from a computer. Mr. Waldman, the Deputy Director of Personal

Property for MTMC stated that although technically he was not the CO, he functioned as the CO in the MTMC system. He also alleged that he personally made the decision that plaintiff's bid was not responsive on or about June 8, 1983 when he alleges the bids were rejected. Mr. Waldman, as will be demonstrated below, exercised his discretion in determining that plaintiff would not be permitted to submit a substitute computer program to correct the format or to submit another new tape with the proper format. Because the contracting officer exercised his discretion, the case is more comparable to *Related Industries v. United States,* 2 Cl.Ct. 517 (1983) (MILLER, J.), than the situation in *Gibraltar, supra,* where the contracting officer was precluded by statute from accepting plaintiff's bid when it was determined to be other than a small business by the Small Business Administration.[8]

Therefore, in order to resolve the jurisdictional issue, this Court must determine whether the bid was responsive, *i.e.,* a determination on the merits. *See Keco Industries, Inc. v. United States,* 203 Ct.Cl. 566, 575–76, 492 F.2d 1200, 1205–06 (1974), where the Court of Claims held that this Court had to review whether a bid was responsive in order to determine if the bidder had received full and fair consideration by the contracting officer. *See also Continental Business Enterprises, Inc. v. United States,* 196 Ct.Cl. 627, 638, 452 F.2d 1016, 1022 (1971); *Demat Air Inc. v. United States,* 2 Cl.Ct. 197 (1983) (GIBSON, J.).

### The Ambiguity Issue

■ Plaintiff has steadfastly maintained that the Standing Instructions are ambiguous as to the magnetic tape format for rate filings.

As already indicated, Mr. Robert Ackerman, plaintiff's computer programmer prepared the plaintiff's tapes with only four numeric characters in the field when the rate bid was under $100.00. For example, when the rate bid was $98.89 for the channel, the tape was prepared showing ＿9889 with no lead zero instead of 09889. The MTMC computer was programmed for "right adjustment," meaning that the two numbers on the right would be lined up as cents and any numbers to the left would be dollars.

Section 8 of the Standing Instructions describes the format for rates as follows: Section 8001(b) states that all rates are to be in dollars and cents. Section 8001(f) requires blanks in rate fields where no rates are to be filed. Appendix VIII–A, which gives the most technical description of the rate format, uses the term "N" for numeric field, "LEN" for the length of the field and "5" for the number of characters. No examples of a proper rate submission were included as had been done for other submissions.[9]

Plaintiff bases its claim of ambiguity on the fact that a computer, in any computer language, may treat a blank as a zero in a numeric field. Since no example or specific written instruction informed plaintiff that any nonnumeric character in a numeric field (*i.e.,* a blank) would cause a rejection, the instructions were ambiguous.

Defendant points to the Error Codes in the Standing Instructions, § 8010, which states that:

8010. *Error Descriptions Codes:* Information shown on the ITGBL CARRIER ERROR LISTING and outlined below defines the submission of erroneous rates or records rejected by the system. Records rejected due to error will have the alpha-error description shown. Rates rejected due to error will have the numeric error code shown in front of the rate. Rejections are not correctable.

1) INVALID RATE: This rate has an invalid character on the rate field. A valid rate must be all numeric characters.

---

8. The discretion of the CO under the Standing Instructions will be discussed below.

9. For example, a financial capacity tape entry included in the instructions an example of 00300000 for $300,000, thereby indicating that lead or insignificant zeros were required.

Defendant argues that this section placed plaintiff on notice that any nonnumeric character in the numeric rate field would cause a rejection of its rates. Defendant notes that section 8 Appendix VIII–A describes the rate field as being numeric and having five characters. Therefore, a reasonable computer programmer could only have concluded that a leading zero was required for all four digit rates, e.g., 09899 for $98.99.

Plaintiff's expert, Mr. Delutis, disputed the clarity of the instructions by emphasizing the difference between a numeric field and a numeric character. A "valid rate," as that phrase was used in the error code, Mr. DeLutis argued, only consisted of the numbers in the rate. If only four characters comprised that rate (e.g., $98.99), then plaintiff was in compliance by submitting it without a leading nonsignificant zero which was not part of that rate. Nowhere in the regulations was it specified that an additional character in the numeric field, not part of the rate, had to be a zero.

Mr. Ackerman's view of the above section was that it merely reiterated that if any other characters, such as a percent (%) sign or an alphabetic character, were present in a rate field, it would generate an error. It did not, however, clue him to the leading zero requirement. Since blanks could be used in the rate field when no rate was filed (section 8001(g)) and rates were to be filed in dollars and cents (section 8001(b)), Mr. Ackerman was certain that blank spaces were contemplated where no rate, including nonsignificant zeros, was filed.

Plaintiff thus argues that its interpretation of this ambiguous provision was reasonable and should have been accepted. *In Re Spectrum Arena, Inc.,* 340 F.Supp. 786, 791–92 (E.D.PA 1971), *aff'd,* 462 F.2d 156 (3d Cir.1972).

From the conflicting testimony on this point and from reviewing all the pertinent Standing Instructions sections discussed, this Court has determined that two reasonable interpretations of the format requirements could be reached from reading the Standing Instructions. In short, a latent ambiguity exists. The instructions simply were not clear on this point. *See Mountain Home Contractors v. United States,* 192 Ct.Cl. 16, 21–22, 425 F.2d 1260, 1263–64 (1970). It is clearly not the glaring, obvious ambiguity discussed in *Robert L. Guyler Co. v. United States,* 219 Ct.Cl. 403, 413, 593 F.2d 406, 412 (1979), or *Newsom v. United States,* 230 Ct.Cl. ——, ——, 676 F.2d 647, 650 (1982). *See also Beacon Construction Co. v. United States,* 161 Ct.Cl. 1, 7, 314 F.2d 501, 504 (1963).

This Court is persuaded for several reasons. First, although the numeric field was to contain five characters, there was no instruction given that would have alerted bidders that all "valid *rates*" had to include five numeric characters, *i.e.,* that a four character rate had to be prefaced by a leading nonsignificant zero. An example such as 09989 for $99.89 would have been very helpful and most likely have eliminated this law suit. Second, when section 8001(f) indicates that all rate fields not used were to be blanks, that would tend to reenforce the concept that blanks were interchangeable with zeros.[10] Third, giving examples of lead zeros for tonnage and financial capacity reenforced the view that if lead zeros were required in rate fields, the instructions would have so stated.[11]

For all of the above reasons, the Court finds that the instructions were ambiguous and that the plaintiff's interpretation of the

---

**10.** This Court is aware of MTMC's reasonable explanation that the use of all blanks eliminated the rate of $00.00 which would have been the low bid and created computer programming difficulties. However, it undercuts defendant's contention that the computer could not be programmed to regard blanks as nullities. In addition, a bid of $00.00 is a highly unlikely and suspect event.

**11.** The fact that no one else encountered this "ambiguity" is not too surprising in view of the relatively few companies that produce and file their own tapes. The vast majority of the forwarders used one of three computer service companies to file their tapes.

instructions comes within the zone of reasonableness discussed in *WPC Enterprises, Inc. v. United States,* 163 Ct.Cl. 1, 6, 323 F.2d 874, 876 (1964); *see also Mountain Home, supra.* This conclusion alone would support a finding of substantial responsiveness to the solicitation. However, there is another and much more compelling reason to hold for the plaintiff. The bid submission *as made* contained a mere technical irregularity in format having no significant or material effect on the price, quality or service to be rendered, the administrative time requirements, or the integrity of the competitive bidding process.

### The Minor Irregularity Issue

The plaintiff in this connection has asserted that the Standing Instructions, section 1004 allow MTMC "to waive informalities and minor irregularities in offers received." Plaintiff contends that the lack of leading zeros was but a minor format irregularity that did not affect the rate filed or the integrity of the system. Plaintiff therefore asserts that it should have been allowed to have its bids fully and fairly considered as bid or to be allowed to submit a new tape with the leading zeros included.

Mr. Waldman in his testimony admitted that section 1004 of the Standing Instructions granted MTMC the flexibility to waive minor format errors. Section 1004 states:

> 1004. *Acceptance of Offers.* MTMC reserves the right to reject any or all offers, *to waive informalities and minor irregularities* in offers received, to negotiate or accept or reject initial or subsequent submissions without discussion of rates, and to nonuse or cancel any rate upon due notice, and/or resolicit rates. Additionally, MTMC reserves the right, on 15 days notice, to extend the effective period of rates by 45 days to modify the rate filing period; to change the type of rates being solicited; to resolicit rates as the result of Government or carrier actions; to respond to delaying court injunctions; to respond to data processing failures, strikes, embargoes; and other policy/economic situations; and other similar valid reasons. Initial rate submissions should be based on the most favorable terms to the Government from a price and service standpoint. It is MTMC's sole intent to solicit responsible rates prepared in accordance with sound business decisions. Rates which would, in the view of the carrier, jeopardize the financial viability of a carrier are not desired. Individual rates should be constructed to stand alone without regard to rates for other channels. Each solicitation stands alone; it is not influenced by prior practices or procedures, and will not be subject to modification prior or subsequent to the deadlines or acceptance stipulated unless specifically modified by the Director of Personal Property for the mutual benefit of all parties by letter or telegram prior to the solicitation deadline. [Emphasis added.]

At trial, Mr. Waldman indicated the standards by which he utilized this discretionary grant of authority in general and in this instance. The first standard he mentioned was whether the Government had caused the error. The second and "key" standard was "whether it affects the rates themselves or not."

In regard to the first standard, this Court has already indicated that MTMC is at fault by its failure to write the rate filings instructions clearly and unambiguously.

The second and "key" standard however, according to Mr. Waldman was whether the minor irregularity "affected the rates themselves or not." This "key" standard was basically whether the carrier would gain a competitive advantage by having "multiple opportunities to bid," and destroy "the integrity of the bidding process." In this connection, the plaintiff brought up three instances in the past where bidders were allowed to resubmit rate filing tapes after the deadline.

In the first instance, Imperial Van Lines, one of the largest freight forwarders in the military household goods business, had filed a rate tape for the I/F cycle in Volume 41 that had incorrectly used the format code M (for the Me-Too filing cycle) instead of the

correct Code I. This format error had caused the MTMC computer to reject the entire tape and all the rates contained therein. After discussions between the parties, however, MTMC agreed to accept the tape and work a new computer program around the error. When discussing this case, Mr. Waldman indicated:

And in the classic one, you mentioned the Imperial with one digit being incorrect, then we'd waive to minor irregularities. That's not so deficient. (Ts 202)

Mr. Waldman attempted to convince this Court that the single digit "error" by the plaintiff was different because the tape was processed, whereas in Imperial, the tape was so defective because of the one digit error that none of the tape could be processed. Yet Mr. Waldman admitted that in another exercise of his discretion involving R.D. Simmons and Associates, one of the three large computer service companies serving the forwarders, he had permitted a tape to be corrected where it had been partially run. In that case, it was determined that there was a discrepancy between the number of rates the computer service agent claimed he had filed for other carriers and the computer's own count, a situation more conducive to rate changing. The distinction between a tape partially run and completely run would only be resonable if it related to the "key" issue of whether the rates were being changed by the carrier.

In yet a third instance of his section 1004 discretion, the same R.D. Simmons and Associates was allowed to refile a tape when the original tape had been produced on an outdated tape format, *i.e.*, 800 BPI versus 1600 BPI. An obvious bidder error was again waived.

When questioned about these prior waivers of minor irregularities in the computer format, Mr. Waldman admitted that whether MTMC was at fault was not determinative by itself. He was unable to persuade this Court that any meaningful distinction between the other bidders' format errors and the instant case existed. In only one case (the first Simmons matter) did the possibility exist of bidders changing bids and, in that instance, Mr. Waldman did not believe that had happened. This is readily distinguishable from the case of *Rossetti Contracting Co. v. Brennan*, 508 F.2d 1039, 1046 (7th Cir.1975), where the court found that a major irregularity[12] causing a determination of nonresponsiveness was not waived by prior administrative decisions because such decisions were clearly distinguishable.[13]

Therefore, this Court must evaluate whether the inclusion of blanks instead of leading zeros would "affect the rates themselves," MTMC's key policy consideration. It is to be noted that the standard of MTMC as stated by Mr. Waldman closely tracks the standards set down by the Court. *See Toyo Menka Karsha, Ltd. v. United States*, 220 Ct.Cl. 210, 218, 597 F.2d 1371, 1376 (1979), where the court quoted *Prestex, Inc. v. United States*, 162 Ct.Cl. 620, 320 F.2d 367 (1963), for the proposition that "deviations may be waived by the contracting officer provided they do not go to the substance of the bid or work an injustice to other bidders. A substantial deviation is defined as one which affects either the price, quantity or quality of the article offered." 162 Ct.Cl. at 627, 320 F.2d at 372. *Cf.* DAR 2–405, 32 C.F.R. § 2–405 (1978).[14]

---

12. *Cf. Otis Elevator v. Washington Metropolitan Area Transit Authority*, 432 F.Supp. 1089 (D.D.C.1976), where a minor irregularity was held responsive even where the policy consideration of affirmative action (as in *Rossetti*) was involved. The distinction was that the lack of *commitment* to affirmative action goals in *Rossetti* made the irregularity a major one.

13. An agency acting in a judicial capacity can establish an "administrative interpretation" of the Standing Instructions. *Rossetti, supra,* at

1046. The court did not reach the legality of the prior exercise of discretion because those prior actions were clearly distinguishable from the situation at bar.

14. DAR 2–405 states:
"A minor informality or irregularity is one which is merely a matter of form or is some immaterial variation from the exact requirements of the invitation for bids, having no effect or merely a trivial or negligible effect on price, quality, quantity, or delivery of the sup-

Employing this standard to the instant case demonstrates that a minor irregularity was involved.[15]

Seventy-three percent (1,883) of plaintiff's rates were rejected.[16] In each instance, the only error in format involved the absence of a "leading nonsignificant zero." The defendant contends that this format error was not a minor irregularity for four reasons.

First, defendant argues that to allow the correction would affect the rates. Mr. Waldman stated that he could not tell whether plaintiff had intended to bid at a rate from either $100 to $900 more than that submitted. This explanation is untenable. Plaintiff submitted a computer printout of its rates in dollars and cents with its initial computer tape containing the rates. Defendant has not argued that that printout or the subsequent tape contain rates different from the initial tape other than a nonsignificant zero where blanks had been utilized. It is highly unlikely that 73 percent of plaintiff's rates would be off by a factor of $100 or multiples thereof. Had the rates been accepted and then had plaintiff argued that it intended a higher rate (of say $100 more than shown), it would be subject to the MIRF procedures which require clear and convincing evidence.[17] In any event, these factors are not present. Plaintiff seeks no change in the rates submitted prior to the initial filing deadline.

Second, the defendant suggests that plaintiff would derive a competitive advantage if it were permitted to correct its computer format. Given the fact that plaintiff's rates were submitted on time and remain the same, this argument is equally untenable. The carriers were not competing to perform a computer format correctly but rather to provide a service to military personnel at the lowest competitive price. The MTMC policy favoring competition and its end product of low cost and efficient service must predominate.

Third, the defendant argues that MTMC, but its Standing Instructions, had clearly put the burden of submitting tapes with a proper format on the carrier and that the error codes specifically provide that rejections for format errors are not correctable. Any weight remaining to this contention in light of section 1004 and the admitted application of that section by MTMC in the past is undercut by the legal concept of what amounts to a responsive bid. Several decisions of the Comptroller General are found to be helpful in this regard.

In B–177368, 52 Comp.Gen. 604, the Comptroller General was presented with an Invitation for Bids (IFB) containing the following language:

> This solicitation contemplates award of a Requirements Contract. Offerors are cautioned that a unit price must be offered for the initial order quantity, when a quantity is shown, and each increment of the follow-on. Offerors failing to set forth a price for the initial order quantity, if applicable, and each increment of the follow-on quantity shall be considered nonresponsive and rejected (or in the case of proposals, may be rejected).

On the date the bids were opened, the contractor's unit price for a certain type of item was $1,491. However, the contractor failed to state a unit price for items 1

---

plies or performance of the services being procured, and the correction or waiver of which would not affect the relative standing of, or be otherwise prejudicial to, bidders. The contracting officer shall either give to the bidder an opportunity to cure any deficiency resulting from a minor informality or irregularity in a bid, or, waive any such deficiency where it is to be advantage of the Government. * * *"

**15.** *See also, Demat Air, Inc., supra.*

**16.** A total of 1,895 of plaintiff's rates were rejected. Plaintiff does not contest the rejection of 12 of its rates which were coded to the wrong location. The distinction between that error and the irregularity remedied by this Court's action is apparent.

**17.** MIRF procedures involve instances where accepted rates were allegedly erroneous. The relief there is withdrawal of the rate. Such a situation is distinguishable from a format technicality, such as is found in this case, since here the error does not affect the rates themselves. *See* Standing Instructions, section 3003.

through 5, 6 through 15 and 26 through 35 out of a large number of items. The contracting officer nevertheless held the bids to be responsive because the contractor had written a letter to the contracting officer on the following day regarding the omission, indicating that $1,491 had been intended in the blank spaces. A competitor filed a bid protest alleging that the bid was clearly nonresponsive and that it should be awarded the contract.

The Comptroller General agreed that the bid was not technically responsive but noted that there was an exception to the normal rule that a failure to include a price is nonresponsive. "[I]f the erroneous bid itself establishes a definite and easily recognizable pattern of prices which clearly indicates not only that the alleged error is anomalous to the pattern but also that the allegedly intended figure is one which is solely compatible with the pattern * * *", quoting B–150318(2), June 6, 1963, then the bid is responsive. *See also* B–137971, December 9, 1958; B–146329, August 28, 1961. The Comptroller General determined that the contractor's pattern of consistently bidding $1,491 for a certain type of item established such a pattern. He went on to say in response to similar contentions as those raised by the defendant:

> You further contend that the existence of the various specific admonitions to the bidder that failure to bid on an item would cause the bid to be rejected prohibits the corrective action taken by the contracting officer. Contrary to your contention, application of the pricing pattern rule is not precluded by the various cautionary provisions of the IFB. *See* B–150318(2), *supra,* where the bidder was allowed to correct a price omission although a provision of the IFB stated that failure to bid on all items would disqualify the bid.

The instant case presents even stronger evidence of a pricing pattern. Here, there can be no doubt whatsoever of the rates intended. A mere glance at the printout that accompanied the submitted tape would confirm the exact dollars and cents that the plaintiff intended to bid.

Finally, defendant argues that the allowance for correction of computer rejections would unduly hamper the administration of the program. It points to the fact that over one million rates were submitted to MTMC for processing in the I/F cycle for this Volume and that over 23,000 rates were rejected by the computer for various reasons. Mr. Waldman suggested that reprogramming the computer to rerun plaintiff's tape was not technically feasible and that a new tape's entry would cause a three week delay in the already tight time schedule. Thus, administrative necessity dictated that plaintiff's bids be rejected.

The Court does not accept these contentions. Plaintiff's expert demonstrated a computer program to have all blanks converted to zeros and defendant's computer expert, Mr. Halevsky, agreed that such a program was not complex. Mr. Halevsky in fact suggests a 10-day delay if plaintiff's rates were to be rerun. Also, when pressed, defendant's witnesses conceded that no significant delay and disruption of the system had ever occurred despite numerous errors both by the contractors and the Government in the tape submissions and processing. The Government has never had to invoke their extension authority contained in section 1004. The sheer volume of rates and the complexity of the program, in another day and age when giant computers did not exist, might be more persuasive of the necessity for the total rejection of any format problem. But computer technology today is beyond that and the actual practice of MTMC with regard to permitting resubmission of tapes by other contractors belies any argument of administrative necessity. In this regard, it is noted that the IGBDL program has built in "cushioning time" because errors occur on a regular basis. Mr. Waldman stated, in fact, that this procurement was in the corrective pre-award phase at this very time.

This Court's power to effect complete relief in this pre-award stage of the procurement process would be severely hampered if mere convenience of the contract-

ing agency during a corrective pre-award period became the rule. Obviously, if there are no corrections, things will flow more efficiently; but efficiency alone is not nor should it be the legal standard.

Although this Court reaches a different conclusion than found in *Dean, supra,* it does so based on the evidence presented and the distinctive facts involved herein. The Court has no intention of opening Pandora's Box to any bidders that attempt to resubmit bids affecting the rates themselves.

## CONCLUSION

In view of the above discussion, this Court concludes that the plaintiff has met its heavy burden of showing substantial compliance with the solicitation. Plaintiff has clearly and convincingly demonstrated that the filing of its four digit rates with no lead zero was a result of ambiguous instructions, and was but a minor irregularity in format that should be allowed to be corrected. The Court believes that the failure of MTMC to allow the correction was arbitrary and unreasonable and therefore an abuse of discretion.

Allowing plaintiff to file a new tape of its rates complete with lead zeros (or waive and rerun plaintiff's old tape using a lead zero bypass program) would not change the price, quantity, or quality that the plaintiff originally bid. There could be no manipulation of bids. The plaintiff would gain no competitive advantage over other bidders, and the refiling will redound to the benefit of the Government if in fact any of plaintiff's rates as filed prove to be the lowest rates filed. The MTMC rate filing system could accommodate the minor delay in placing plaintiff's new tape back into the system and still meet the performance period to commence October 1, 1983 with no difficulty.

For all of the above reasons, this Court hereby declares and orders:

(a) that MTMC abused its discretion in refusing to allow plaintiff to resubmit a new magnetic tape with leading zeros inserted in front of its original bid rate filing submitted May 25, 1983;

(b) that MTMC be permanently enjoined from publishing any low rates accepted on its I/F filing cycle for Volume 47 of its ITGBL program unless and until it accepts plaintiff's new magnetic tape with lead zeros included in front of its original bid four digit rate filings, and gives those rate filings (bids) full and fair consideration;

(c) that any of plaintiff's new rate filing that deviates from the Standing Instruction will not be considered to be a part of this Court's order and may be rejected; and

(d) that any rates originally filed on May 25, 1983 and which were rejected for reasons other than lead zero reasons are not included in this Court's order.

Therefore it is ordered that the plaintiff's Cross-Motion for Summary Judgment is hereby granted, and the Defendant's Motion for Summary Judgment is hereby denied.